1

2

3

4

5

6

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

7   IN RE TOYOTA RAV4 HYBRID FUEL          Case No.  20-cv-00337-EMC
    TANK LITIGATION.
8
                                           **ORDER GRANTING IN PART AND**
9                                          **DENYING IN PART DEFENDANT'S**
                                           **MOTION TO DISMISS**
10                                         **CONSOLIDATED COMPLAINT**

11                                         Docket No. 66

12

13

14                    **I.      INTRODUCTION**

15          This putative consumer class action is brought by thirty-six plaintiffs ("Plaintiffs") from

16   twenty-eight states on behalf of a nationwide class of "[a]ll persons who purchased or leased"

17   2019 and 2020 Toyota RAV4 Hybrid vehicles ("Vehicle[s]"), as well as twenty-eight subclasses

18   based on the state in which the Vehicles were purchased or leased.  *See* Docket No. 55 ("Compl.")

19   ¶¶ 84-85.  Plaintiffs allege that Defendant Toyota Motor Sales, U.S.A., Inc. ("Toyota" or "TMS")

20   falsely represented in marketing and ownership materials that the Vehicles' fuel tank capacity is

21   14.5 gallons when it is actually 8-11 gallons, thus significantly reducing the Vehicles' range on a

22   single tank of gas.  Plaintiffs bring ninety state-law claims against Toyota for breach of express

23   warranty, breach of the implied warranty of merchantability, violations of various consumer

24   protection and unfair competition statutes, and unjust enrichment.  Plaintiffs seek damages as well

25   as injunctive and declaratory relief.

26          Pending before the Court is Toyota's motion to dismiss Plaintiffs' consolidated class

27   action complaint on the grounds that Plaintiffs lack Article III standing, that they fail to state

28   claims for relief under Rule 12(b)(6), that they lack standing for injunctive and declaratory relief,

and that they cannot pursue their claims as a nationwide class. The Court previously ruled on a number of these issues at the motion hearing of December 18, 2020; it here reiterates those conclusions and resolves the issues it declined to decide at the hearing. For the reasons given below, Toyota's motion to dismiss is **GRANTED in part** and **DENIED in part**.

## II.   BACKGROUND

The facts alleged in Plaintiffs' consolidated class action complaint are straightforward. Toyota "is a manufacturer and distributor of new motor vehicles"; it "markets and advertises" RAV4 Hybrids, oversees Toyota dealers, and develops the company's nationwide marketing and informational materials." Compl. ¶ 2. Plaintiffs allege that "Toyota advertises and represents in its promotional materials, specifications, and owner's manual that the RAV4's fuel tank capacity is 14.5 gallons" and that the Vehicles' "total mileage range is 580 miles." *Id.* ¶ 3. Toyota, however, "failed to disclose that the RAV4s will not accept a full tank of fuel" and are in fact capable of holding only 8-11 gallons of fuel. *Id.* ¶ 3, 63. Plaintiffs point to "[n]ews reports, customer complaints, and Toyota's own statements" as showing "that the RAV4s' fuel tank shape prevents a full fuel tank refill by up to several gallons" such that "the vehicles' mileage range on a full tank of fuel is approximately 330-480 miles." *Id.* ¶¶ 3-4 (emphasis removed). Plaintiffs thus allege that they "have "suffered diminished market value of their RAV4 vehicles as a direct result of Toyota withholding material information and/or making misleading statements regarding the RAV4's fuel tank capacity and mileage range." *Id.* ¶ 5.

This case is brought on behalf of thirty-six plaintiffs from twenty-eight states, including California, Florida, New York, and Texas.[1] *Id.* While the details of Plaintiffs' allegations occasionally vary, the essentials of their accounts are consistent. Each argues that he "believed and relied upon Toyota's representations that the RAV4's fuel tank capacity was 14.5 gallons" with "a combined 40 MPG rating," and that its "mile range [was] approximately 580 miles"; that "Toyota's representations were material" to him; that he "purchased his RAV4 in part because of

---

[1] Toyota has included in its motion a comprehensive table listing, *inter alia*, Plaintiffs' states of residence, the model year of the car they purchased or leased, and the date of their purchase or lease. *See* Docket No. 66-1 at 4-6.

United States District Court
Northern District of California

the long distance he expected to be able to travel on a single tank of fuel"; that he discovered shortly after purchase or lease "that the vehicle will only accept approximately [8-11] gallons of fuel when the tank is nearly empty," resulting in a mileage range of only 330-480 miles; that this defect caused him "to make more frequent trips to refuel his RAV4 than he should have been required to based on Toyota's misrepresentation," and that he has "suffered actual damages in the form of the diminished value of his RAV4," as well as "more frequent fueling" and "future attempted repairs."  *See, e.g.*, Compl. ¶ 6; *see also id.* ¶¶ 7-39.  Each plaintiff concludes by alleging that had he "known the actual fuel tank capacity and mileage range prior to his purchase, he would either not have purchased the RAV4 or would have paid less for it."  *See id.*

The complaint further alleges that Toyota's guarantees about the Vehicles' fuel-tank size, mileage range, and/or miles-per-gallon ("MPG") estimates are included on the company's website (*id.* ¶¶ 47-49), in the Vehicles' owner's manual (*id.* ¶ 50), on the "Monroney" sticker displayed in the Vehicles' windows prior to purchase (*id.* ¶ 51), in the 2019 RAV4 marketing brochure (*id.* ¶ 55), and in video advertisements (*id.* ¶¶ 56-57).  In the latter two instances, TMS also incorporated the marketing slogan "Go farther. Go faster." and boasted that the Vehicles' drivers will make "fewer trips to the pump."  *Id.* ¶¶ 55, 57.  Plaintiffs also note that RAV4's hybrid model has a suggested retail price that is "nearly $2000 higher than the non-hybrid model."  *Id.* ¶ 59.  Moreover, the Vehicles come with an express warranty—the "New Vehicle Limited Warranty" ("NVLW")—that covers "repairs and adjustments needed to correct defects in materials or workmanship of any part supplied by Toyota."  *Id.* ¶ 60-61 (quoting Docket No. 66-2 ("Landis Decl."), Ex. 2 at 13).

Plaintiffs further allege that, as of September 2020, "more than 200 complaints have been filed with the National Highway Traffic Safety Administration ('NHTSA') regarding 'fuel/propulsion system' issues with the 2019/2020 RAV4," all of which are substantially similar to Plaintiffs' allegations in the instant case.  *Id.* ¶ 65; *see also id.* ¶¶ 65-69 (quoting NHTSA complaints).  Plaintiffs also charge that "[t]housands of RAV4 owners have logged similar complaints on online forums and discussions" and that some "have even posted videos to youtube.com, filming their refuels."  *Id.* ¶ 70, 74.

1   The complaint next asserts that "[a]t least as early as November 5, 2019, Toyota knew

2   about the RAV4's fuel tank" problems. *Id.* ¶ 75.  On that date, TMS "notified at least some

3   Toyota service providers" about the issue via a "Toyota Tech Tip," noting that the "[c]oncern is

4   under investigation." *Id.* ¶ 76.  In late December 2019, an article in the trade publication

5   *Automotive News* reported complaints among Vehicle owners that the Vehicles could only hold

6   approximately 11 gallons of gasoline and so could not "get anywhere close to the 580 miles of

7   expected range." *Id.* ¶ 78.  In response to the article, TMS confirmed that it was "investigating a

8   fuel tank shape issue on certain RAV4 Hybrid vehicles," where "variations in fuel tank shape may

9   prevent a full refill by up to several gallons." *Id.* ¶ 79 (emphasis removed).  As plaintiffs point

10  out, the article also noted that Toyota had "changed the design of its fuel tank" starting with the

11  2019 RAV4 Hybrid model. *Id.* ¶ 80.  In February 2020, the Fox television affiliate for the Dallas-

12  Fort Worth, Texas, area also reported on the Vehicles' "[g]as tank design flaw," "detailing

13  complaints by RAV4 purchasers throughout the country." *Id.* ¶ 81.  In response, Toyota again

14  confirmed that it was investigating the problem and theorized that "variations in fuel tank shape

15  may prevent a full refill by up to several gallons." *Id.* ¶ 82.  In a follow-up segment that same

16  month, the Fox affiliate reported that Toyota "would offer RAV4 owners an 'interim fix' for the

17  fuel tank issues until a  final remedy is identified"; Toyota acknowledged, however, that this fix

18  "may not prevent the condition from recurring." *Id.* ¶ 83 (emphasis removed).

19  As part of its motion to dismiss, Toyota observes that Plaintiffs "do not allege that the

20  Environmental Protection Agency ('EPA')-estimated Miles Per Gallon ('MPG') numbers are

21  false, and admit that, even with the alleged defect, the vehicles have a range of approximately 330-

22  480 miles." Docket No. 66-1 ("Mot.") at 3 (citing Compl. ¶ 4).  Toyota also notes that Plaintiffs

23  do not "identify any advertisement or representation by TMS that [they specifically] reviewed and

24  relied on regarding mileage range." *Id.* at 6 (citing Compl. ¶¶ 6-39) (emphasis removed).  Toyota

25  goes on:

26      None of [the Plaintiffs] allege that they have been unable to drive
        their RAV4 Hybrid vehicles, or that they have run out of gas.  Nor
27      do Plaintiffs allege any physical injury or that they have incurred
        any out-of-pocket losses as a result of repairs (or otherwise)
28      regarding the alleged defect. . . . [With one exception,] [n]one of the

4

> Plaintiffs allege that they attempted to re-sell their vehicles and received less value for their vehicles than they would have absent the alleged defect.[2]

*Id.* Finally, TMS observes that eighteen of the thirty-six plaintiffs fail to allege that they presented their vehicles for repair to an authorized Toyota dealership after discovering the fuel-tank defect. *Id.* at 13 (citing Compl. ¶¶ 6-15, 17-18, 20-23, 26, 28, 30-39).

Plaintiffs originally filed a class action complaint on January 15, 2020. Docket No. 1. Over the following months, several cases from elsewhere in this District were related to, and eventually consolidated with, the instant case. *See, e.g.*, Docket Nos. 37 and 53. Pursuant to these developments, Plaintiffs filed their 198-page consolidated class action complaint on September 14, 2020. *See* Compl. Toyota's motion to dismiss followed on October 14, 2020. *See* Mot. Plaintiffs then submitted an opposition brief on November 4, 2020. *See* Docket No. 69 ("Opp'n"). Following a brief continuation of the motion hearing, Toyota filed its reply brief on November 25, 2020. *See* Docket No. 75 ("Reply").[3]

## III.   LEGAL STANDARD

A.   Rule 12(b)(1)

Under Federal Rule of Civil Procedure 12(b)(1), a district court must dismiss a complaint if it lacks subject matter jurisdiction to hear the claims alleged in the complaint. Fed. R. Civ. P. 12(b)(1). In order for a district court to have subject matter jurisdiction over a plaintiff's claims

---

[2] Toyota adds that, "[a]lthough one plaintiff alleges he got less value for his vehicle when he traded it in[,] that allegation is not plausible considering the trade-in value he alleges is within market norms." Mot. at 6.

[3] The parties were permitted additional pages for all three briefs, with the motion to dismiss and opposition briefs extending to thirty-seven pages and the reply brief to twenty-five pages. *See* Docket Nos. 64 and 65.

In the parties' Joint Case Management Statement of December 10, 2020, Toyota asserts that in May 2020 it "issued a Customer Support Program to address [the] alleged refueling performance issue with the Subject Vehicles that is the subject of this litigation." Docket No. 77 at 2. "In late October 2020, TMS launched the repair portion of the Customer Support Program and began []notifying owners and lessees of the Subject Vehicles, including but not limited to Plaintiffs, regarding the availability of the repair in early November 2020." *Id.* TMS represents that the repair is "currently being implemented" and that it "remedies the alleged refueling performance issues for Toyota customers with affected Subject Vehicles." *Id.* As of December 2020, Plaintiffs were "evaluating whether the repair program . . . which Toyota recently began to roll out . . . mitigates the fuel-tank defect." *Id.*

they must present a live case or controversy, as required by Article III of the U.S. Constitution. *See* U.S. Const. art. III § 2, cl. 1.  And in order for there to be a case or controversy within the meaning of Article III, a plaintiff must have standing to pursue his claims.  To satisfy the standing requirement, a plaintiff bears the burden of establishing three elements: (1) "the plaintiff must have suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical"; (2) "there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court"; (3) "it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992) (internal quotations omitted).

A party moving to dismiss under Rule 12(b)(1) may mount a facial challenge to the complaint by asserting that ''the allegations contained in the complaint are insufficient on their face to invoke federal jurisdiction.''  *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004).  In ruling on a facial challenge, a court ''must accept as true all material allegations of the complaint and must construe the complaint in favor of the complaining party.''  *Warth v. Seldin*, 422 U.S. 490, 501 (1975).

B.  Rule 12(b)(6)

Federal Rule of Civil Procedure 8(a)(2) requires a complaint to include "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  A complaint that fails to meet this standard may be dismissed pursuant to Rule 12(b)(6).  *See* Fed. R. Civ. P. 12(b)(6).

To overcome a Rule 12(b)(6) motion to dismiss after the Supreme Court's decisions in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), a plaintiff's "factual allegations [in the complaint] must . . . suggest that the claim has at least a plausible chance of success."  *Levitt v. Yelp! Inc.*, 765 F.3d 1123, 1135 (9th Cir. 2014) (internal quotation omitted).  The court "accept[s] factual allegations in the complaint as true and construe[s] the pleadings in the light most favorable to the nonmoving party."  *Manzarek v. St.*

United States District Court
Northern District of California

6

United States District Court
Northern District of California

1    *Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008). But "allegations in a

2    complaint . . . may not simply recite the elements of a cause of action [and] must contain sufficient

3    allegations of underlying facts to give fair notice and to enable the opposing party to defend itself

4    effectively." *Levitt*, 765 F.3d at 1135 (quoting *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir.

5    2011)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the

6    court to draw the reasonable inference that the defendant is liable for the misconduct alleged."

7    *Iqbal*, 556 U.S. at 678. "The plausibility standard is not akin to a 'probability requirement,' but it

8    asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting

9    *Twombly*, 550 U.S. at 556).

10    C.    <u>Rule 9(b)</u>

11        Claims sounding in fraud or mistake are subject to the heightened pleading requirements of

12    Federal Rule of Civil Procedure 9(b), which requires that a plaintiff bringing such a claim "state

13    with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). To clear

14    the heightened standard of Rule 9(b), a plaintiff must identify the ''who, what, when, where, and

15    how'' of the alleged misconduct and explain how the statement or omission complained of was

16    false or misleading. *Vess v. Ciba–Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003); *see*

17    *also Kearns v. Ford Motor Co.,* 567 F.3d 1120, 1124 (9th Cir. 2009) (holding that nondisclosure

18    claims sound in fraud and are subject to Rule 9(b)). The purpose of Rule 9(b) is to require that a

19    plaintiff's allegations be "specific enough to give defendants notice of the particular misconduct

20    which is alleged . . . so that they can defend against the charge and not just deny that they have

21    done anything wrong." *Swartz v. KPMG LLP*, 476 F.3d 756, 764 (9th Cir. 2007). Rule 9(b)

22    allows, however, that "[m]alice, intent, knowledge, and other conditions of a person's mind may

23    be alleged generally." Fed. R. Civ. P. 9(b). Notably, "a fraud by omission claim can succeed

24    without the same level of specificity required by a normal fraud claim" since plaintiffs in such

25    cases "will not be able to specify the time, place, and specific content of an omission as precisely

26    as would a plaintiff" in an affirmative misrepresentation case. *Falk v. Gen. Motors Corp.*, 496 F.

27    Supp. 2d 1088, 1098-99 (N.D. Cal. 2007); *see also Sciacca v. Apple, Inc.*, 362 F. Supp. 3d 787,

28    799-800 (N.D. Cal. 2019) (applying the pleading standard of Rule 8 to an omission-based

1  consumer protection claim).

2  D.    Leave to Amend

3        If the court dismisses a complaint, it ''should grant leave to amend even if no request to

4  amend the pleading was made, unless it determines that the pleading could not possibly be cured

5  by the allegation of other facts.'' *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000).  In making

6  this determination, the court should consider factors such as ''the presence or absence of undue

7  delay, bad faith, dilatory motive, repeated failure to cure deficiencies by previous amendments,

8  undue prejudice to the opposing party and futility of the proposed amendment.'' *See Moore v.*

9  *Kayport Package Express*, 885 F.2d 531, 538 (9th Cir. 1989).

10                          **IV.    DISCUSSION**

11        Toyota's motion to dismiss is divided into seven main parts.  Toyota first argues that

12  Plaintiffs lack standing "because they do not plausibly allege an actual, non-speculative injury"

13  from the purported fuel-tank defect, such as an imminent "safety hazard," "out-of-pocket costs for

14  repairs," or "diminution in value" on resale.  Mot. at 1-2, 8-10.  Second, Plaintiffs cannot plead

15  breach of express warranty as "TMS's express warranty in question does not cover *design* defects"

16  but only manufacturing defects.  *Id.* at 2, 10-15 (emphasis in original).  Third, Plaintiffs' claims

17  for breach of the implied warranty of merchantability are also inadequate because "they make no

18  plausible allegations that the vehicles are unfit for their ordinary purpose."  *Id.* at 2, 15-19.

19  Fourth, Plaintiffs fail to state consumer-protection or unfair-competition claims because, *inter*

20  *alia*, (a) the claims are preempted by federal law, (b) Plaintiffs fail to allege reliance on Toyota's

21  marketing materials, and (c) various state-specific requirements have not been met.  *Id.* at 2-3, 19-

22  34.  Fifth, Plaintiffs' unjust enrichment claim fails because they erroneously seek to apply

23  California law to the entire class and, in any event, California doesn't recognize a standalone

24  claim for unjust enrichment.  *Id.* at 3, 34-36; Reply at 2 (revising argument).  Sixth, Plaintiffs lack

25  standing to seek injunctive and declaratory relief since none of them "alleges that s/he is likely to

26  purchase another Subject Vehicle."  Mot. at 3, 36.  And seventh, Plaintiffs cannot represent a

27  nationwide class since "they have no standing to represent consumers in states where Plaintiffs do

28  not reside and did not purchase a Subject Vehicle."  *Id.* at 3, 36-37.  The Court addresses each of

United States District Court
Northern District of California

8

1   these arguments in turn.[4]

2   A.    Standing (Injury-in-Fact)

3          Injury-in-fact is "the first and foremost of standing's three elements."  *Spokeo, Inc. v.*

4   *Robins*, 136 S. Ct. 1540, 1547 (2016) (internal quotation omitted).  "To establish injury in fact, a

5   plaintiff must show that he or she has suffered 'an invasion of a legally protected interest' that is

6   'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'"  *Id.* at

7   1548 (quoting *Lujan*, 504 U.S. at 560).  For an injury to be "concrete," the *Spokeo* Court

8   explained, it "must actually exist": It must be "real, and not abstract."  *Id.* (internal quotation

9   marks omitted).  And for an injury to be particularized, "it must affect the plaintiff in a personal

10  and individual way" such that the plaintiff "personally has suffered some actual or threatened

11  injury."  *Id.* (internal quotation omitted).

12

13  ───────────────

    [4] Toyota also filed a request for judicial notice along with its motion to dismiss.  *See* Docket No.
14  67 ("RJN").  Under Federal Rule of Evidence 201, a court "may judicially notice a fact that is not
    subject to reasonable dispute because it: (1) is generally known within the trial court's territorial
15  jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot
    reasonably be questioned."  Fed. R. Evid. 201(b).  Courts generally "may not consider material
16  outside the pleadings when assessing the sufficiency of a complaint under Rule 12(b)(6)," but a
    defendant "may seek to incorporate a document into the complaint if the plaintiff refers
17  extensively to the document or the document forms the basis of the plaintiff's claim."  *Khoja v.
    Orexigen Therapeutics, Inc.*, 899 F.3d 988, 998, 1002 (9th Cir. 2018).  Here, Toyota asks the
18  Court to take notice of excerpts from the Vehicle Owner's Manuals and Warranty Manuals (RJN,
    Exs. 1-4), a printout from the EPA website titled "Your Mileage Will Vary" (*id.*, Ex. 5), and a
19  printout from the online version of the Kelley Blue Book concerning car depreciation (*id.*, Ex. 6).
    "Plaintiffs do not oppose judicial notice of Exhibits 1-4 . . . to the extent these documents are
20  incorporated by reference in" the complaint.  Docket No. 70 at 1.  Plaintiffs do, however, oppose
    notice of Exhibits 5 and 6 "because these webpages are not central to Plaintiffs' claims, are not
21  referenced in Plaintiffs' Complaint, improperly introduce expert opinion, and are introduced by
    TMS for the truth of their contents."  *Id.*  Toyota counters that, under Ninth Circuit law, courts
22  "may take judicial notice of matters of public record," particularly "records and reports from
    administrative agencies," Docket No. 76 at 2 (quoting *MGIC Indem. Corp. v. Weisman*, 803 F.2d
23  500, 504 (9th Cir. 1986)); Toyota also argues that district courts "have taken judicial notice of
    information from the Kelley Blue Book website, finding that [it] is not subject to reasonable
24  dispute," *id.* at 5 (citing, *e.g.*, *Weisz v. Volkswagen Grp. of Am., Inc.*, 2016 WL 9342527, at *1
    (C.D. Cal. Nov. 30, 2016)).
25
            Regarding Exhibits 5 and 6 of the RJN, Plaintiffs are correct that the complaint does not
26  "refer[] extensively to the document[s]," nor do they "form[] the basis of the[ir] claim[s]."  *See
    Khoja*, 899 F.3d at 1002.  However, insofar as the complaint briefly references EPA MPG
27  estimates and the Kelley Blue Book, *see, e.g.*, Compl. ¶¶ 52, 63 n.14, , and Plaintiffs do not
    contest the documents' authenticity, the Court hereby takes notice of the documents themselves
28  without acknowledging the truth of any matters asserted therein.  *See Lee v. City of Los Angeles*,
    250 F.3d 668, 688 (9th Cir. 2001).

United States District Court
Northern District of California

United States District Court
Northern District of California

1    Plaintiffs' theory of standing in this case is based on the "diminished market value of their

2    RAV4 vehicles as a direct result" of Toyota's misrepresentations about "fuel tank capacity and

3    mileage range."  Compl. ¶ 5.  In arguing that Plaintiffs lack standing to pursue their claims, Toyota

4    argues that allegations of "diminished value," overpayment, or "disappointed expectations" do not

5    establish a cognizable harm for purposes of Article III.  *Id.* at 8-9.  Toyota points out that only one

6    plaintiff claims to have attempted to resell his vehicle and received less money than he would have

7    absent the alleged fuel-tank defect.  *Id.* at 9; *see also* Compl. ¶ 22 (stating that Plaintiff Martin

8    from Montana "has suffered actual damages in the form of the diminished trade-in value of his

9    RAV4").[5]  Toyota also asserts that Plaintiffs fail to allege "that they personally incurred any out-

10   of-pocket damages related to any repairs performed on their vehicles," "that they have suffered

11   physical injury," or that they "have stopped driving their vehicles."  *Id.*  The company relies on a

12   series of cases from the Central District of California—including *Tae Hae Lee v. Toyota Motor*

13   *Sales, U.S.A., Inc.*, 992 F. Supp. 2d 962 (C.D. Cal. 2014), *In re Toyota Motor Corp. Unintended*

14   *Acceleration Marketing, Sales Practices, and Products Liability Litigation*, 754 F. Supp. 2d 1145

15   (C.D. Cal. 2010), and *Gertz v. Toyota Motor Corp.*, 2011 WL 13142144 (C.D. Cal. Apr. 28, 2011)

16   ("*Gertz I*")—for the proposition that plaintiffs cannot rely on vague allegations that they did not

17   receive the benefit of their bargain to establish injury in fact.  Mot. at 9.

18   Plaintiffs respond that the complaint adequately alleges "actual damages in the diminished

19   value of their RAV4s and ascertainable losses . . . including[] more frequent fueling" and "future

20   attempted repairs."  Opp'n at 4 (citing Compl. ¶¶ 6-21, 23-29).  Plaintiffs further allege that had

21   they "known the actual fuel tank capacity prior to purchase or lease, they would not have

22   purchased or leased the RAV4s or would have paid less for them."  *Id.* (citing Compl. ¶¶ 6-39).

23   Plaintiffs argue that under Ninth Circuit law, as articulated in cases such as *Mazza v. American*

24   *Honda Motor Co.*, 666 F.3d 581 (9th Cir. 2012), "overpayment constitutes 'injury in fact' under

25   Article III."  *Id.* at 3.

26   As the Court stated at the motion hearing, it finds that Plaintiffs have adequately pleaded

27

28   _____
     [5] In its motion, Toyota incorrectly attributes the trade-in allegation to Plaintiff Dennis
     Klinkhammer.  *See* Mot. at 9.

1     injury-in-fact and therefore have standing to pursue their claims for damages.  *See* Docket No. 83

2     ("Hearing Tr.") at 3.  As Plaintiffs argue, the Ninth Circuit has repeatedly held that when a

3     consumer alleges that she would not have purchased property, or would have paid less for it had

4     the seller not misrepresented the property or failed to disclose its limitations, the consumer has

5     plausibly alleged an injury-in-fact.  In *Mazza*, for example, a class of consumers alleged that they

6     would not have purchased Honda vehicles equipped with an enhanced braking system, or would

7     have paid less for them, had the manufacturer disclosed the system's limitations, including that the

8     system might not warn drivers in time to avoid an accident.  *See* 666 F.3d at 586-87.  The

9     defendant, a vehicle manufacturer, argued that plaintiffs had not suffered a cognizable injury but

10    the court disagreed, crediting class members' contentions that they "paid more for the [braking

11    system] than they otherwise would have paid, or bought it when they otherwise would not have

12    done so," because of the manufacturer's alleged misrepresentations.  *Id.* at 595.  "To the extent

13    that class members were relieved of their money by Honda's deceptive conduct," the court held,

14    "they have suffered an injury in fact."  *Id.* (internal quotation omitted); *see also Hinojos v. Kohl's*

15    *Corp.*, 718 F.3d 1098, 1104 n.3 (9th Cir. 2013) (relying on *Mazza* to hold that consumers who

16    purchased merchandise that a store falsely advertised as being "on sale" had suffered an injury-in-

17    fact because they "paid more for a product than they otherwise would have paid, or bought it when

18    they otherwise would not have done so"); *Maya v. Centex Corp.*, 658 F.3d 1060, 1069 (9th Cir.

19    2011) (holding that homeowners in a housing development had suffered an injury-in-fact from

20    homebuilders' alleged failure to disclose that they were advertising to unqualified buyers because

21    "plaintiffs spent money that, absent defendants' actions, they would not have spent").

22         In contrast, the cases that Toyota cites to argue against standing are distinguishable, as they

23    involved plaintiffs' claims of overpayment based on "speculative" product defects that had yet to

24    occur or that did not contradict the defendant's representations about product quality.  *See* Opp'n

25    at 4.  In *Tae Hae Lee*, for example, plaintiffs who purchased Toyota vehicles with an advanced

26    braking function asserted that "they overpaid for their vehicles" and "did not receive the benefit of

27    their bargain" because the function achieved "only a 'negligible' reduction in speed."  *See* 992 F.

28    Supp. 2d at 972, 968.  Plaintiffs, however, did not allege that the braking system failed to

United States District Court
Northern District of California

"perform[] as described" or that they "experienced any problems" with the system. *Id.* at 972. The district court thus held that plaintiffs failed to plead "an actual economic injury because they ha[d] not had any negative experience with the [system] and ha[d] not identified any false representations about the [system] made by Toyota."[6] *Id.* Toyota also cites *Cahen v. Toyota Motor Corp.*, 717 Fed. Appx. 720 (9th Cir. 2017), an unpublished Ninth Circuit opinion, to argue that plaintiffs cannot plead overpayment where "allegations of economic loss are merely conclusory and unsupported by any facts regarding the value of the product" or the alleged defect's "effect on the market." Reply at 3. But in *Cahen* plaintiffs' "economic loss theory [was] not credible," as it was based on the speculative fear "that their vehicles [were] vulnerable to being hacked" even though plaintiffs did "not allege that any of their vehicles ha[d] actually been hacked" or that they were "aware of any vehicles that ha[d] been hacked" in real-world conditions. 717 Fed. Appx. at 723.

Here, Plaintiffs plausibly allege that their vehicles suffer from an existing, provable defect of substantially diminished fuel-tank capacity, and that this defect is significant enough to make the vehicles worth less than they would be without the defect. While Plaintiffs have not provided a quantitative analysis of the defect's impact on the market for their Vehicles (a matter disputed by Toyota), the magnitude of that impact is a question of fact not appropriate for resolution on a motion to dismiss. *See Warth*, 422 U.S. at 501 (stating that, on a facial challenge to subject matter jurisdiction under Rule 12(b)(1), a court "must construe the complaint in favor of the complaining party"). Plaintiffs' harms are therefore "real" and not "abstract" or merely speculative, *see Spokeo*, 136 S. Ct. at 1548, as in cases like *Tae Hae Lee* and *Cahen*.

Plaintiffs have adequately pled a cognizable injury for purposes of Article III and have standing to pursue their claims. The Court **DENIES** TMS's motion to dismiss under Rule 12(b)(1).

---

[6] In reaching this conclusion, the *Tae Hae Lee* court cited the pre-*Mazza* decision of *Toyota Motor Corp.* for the principle that "claims of 'diminished value' and 'overpayment' [are] only allowed to proceed for those plaintiffs who ha[ve] pled 'something more'." 992 F. Supp. 2d at 973 (quoting *Toyota Motor Corp.*, 790 F. Supp. 2d at 1166 n.11). The court implied, however, that allegations that a vehicle feature "fails to work as described" could constitute the requisite "'something more'" that it believed was required for standing. *Id.*

1

2    B.    Express Warranty Claims

3          As Toyota explains, "Plaintiffs assert breach of express warranty claims under the laws of

4    various states that have adopted some iteration of U.C.C. § 2-313."  Mot. at 10 (citing, *e.g.*,

5    Compl. ¶¶ 2, 6, 11).  That provision of the U.C.C. states, in relevant part: ''Any affirmation of fact

6    or promise made by the seller to the buyer which relates to the goods and becomes part of the

7    basis of the bargain creates an express warranty that the goods shall conform to the affirmation or

8    promise.''  U.C.C. § 2-313(1)(a).  While Plaintiffs' express warranty claims focus most

9    prominently on Toyota's New Vehicle Limited Warranty ("NVLW"), the claims are also founded

10   on statements in Toyota's advertising materials and the Vehicles' owner's manuals.

11         1.    NVLW:  Design and Manufacturing Defects

12         TMS argues that Plaintiffs' express warranty claims fail for several reasons, most notably

13   because the complaint alleges a design—rather than a manufacturing—defect, and design defects

14   are not covered by the NVLW's "materials or workmanship" language.  Mot. at 10 (emphasis

15   removed).  The NVLW for both the 2019 and 2020 Vehicles stipulates that it "covers repairs and

16   adjustments needed to correct *defects in materials and workmanship* of any part supplied by

17   Toyota," with some additional exceptions.  Landis Decl., Exs. 2 and 4 at 13 (emphasis added).

18         The parties do not dispute that, as a general matter, ''[a]n express warranty covering

19   'materials and workmanship' does not include design defects.''  *Johnson v. Nissan N. Am., Inc.*,

20   272 F. Supp. 3d 1168, 1176 (N.D. Cal. 2017) (citing, *e.g.*, *Toyota Motor Corp.*, 754 F. Supp. 2d at

21   1180-81; *Gertz v. Toyota Motor Corp.*, 2011 WL 3681647, at *3 (C.D. Cal. Aug. 22, 2011)

22   ("*Gertz II*")); *see also Sloan v. Gen. Motors LLC*, 2017 WL 3283998, at *8 (N.D. Cal. Aug. 1,

23   2017) (stating that "the overwhelming weight of state law authority holds that design defects are

24   *not* covered" under "materials or workmanship" warranties and collecting cases).  California

25   courts have held that a design defect "exists when the product is built in accordance with its

26   intended specifications, but the design itself is inherently defective."  *McCabe v. Am. Honda

27   Motor Co.*, 100 Cal. App. 4th 1111, 1120 (2002).  "[A] design defect 'cannot be identified simply

28   by comparing the injury-producing product with the manufacturer's plans or with other units of the

     same product line, since by definition the plans and all such units will reflect the same design.'"

13

*Cabebe*, 2018 WL 5617732, at *11 (N.D. Cal. Oct. 26, 2018) (quoting *Barker v. Lull Eng'g Co.*, 20 Cal. 3d 413, 429 (1978)).  A manufacturing defect, in contrast, "exists if the product differs from the manufacturer's intended result or if the product differs from apparently identical products from the same manufacturer."[7] *Id.* (quoting Cal. Jury Instr. (BAJI) No. 9.00.3).  With a manufacturing defect, therefore, "the design was appropriate but the manufacturing process deviated from the design." *Rodas v. Porsche Cars. N. Am., Inc.*, 2015 WL 12762064, at *4 (C.D. Cal. Feb. 13, 2015).

The question here is whether Plaintiffs allege only a design defect or some combination of design and manufacturing defects, as the complaint is not explicit one way the other.  In Toyota's view, "[t]he Complaint alleges the defect is due to the design of the fuel tank in the vehicles," as the complaint states that "the RAV4s' fuel tank shape prevents a full fuel tank refill by up to several gallons," references a trade-publication article discussing "the design of [the Vehicles'] fuel tank," and at numerous points expressly alleges that "Toyota failed to inform [Plaintiffs] that RAV4s' [*sic*] contain defectively designed fuel tanks . . . ." *See* Mot. at 12, Reply at 6 (quoting Compl. ¶¶ 3, 80, 162) (emphasis removed).

Plaintiffs counter that their "allegations support a reasonable inference that the defect is a manufacturing defect."  Opp'n at 5.  They cite to an unpublished Ninth Circuit opinion stating that "under California law a manufacturing defect encompasses instances where products differ, even uniformly, from a manufacturer's intended result or design." *Barakezyan v. BMW of N. Am., LLC*, 715 Fed. Appx. 762, 762 (9th Cir. 2018) (citing *Barker*, 20 Cal.3d at 429).  As a result, allegations that all vehicles in a particular make and model "exhibit the defect does not preclude the defect from being a manufacturing defect." *Id.*  Plaintiffs also rely on *Johnson*, in which the court found that plaintiffs did not exclusively allege a design defect simply because they argued "that the defect"—exploding sunroofs—was "present in all relevant models."  272 F. Supp. 3d at 1177.  Insofar as plaintiffs in that case "plausibly alleged that their vehicles differ[ed] from the product the manufacturer intended to sell," the court concluded that they plausibly pled a manufacturing

---

[7] "The classic example" of a manufacturing defect "is the one soda bottle in ten thousand that explodes without explanation." *Cabebe*, 2018 WL5617732 at *11 (internal quotation removed).

United States District Court
Northern District of California

1    defect.  *Id.* at 1177-78.  Plaintiffs further argue that "to the extent there is any ambiguity on this

2    matter, the issue is better left for post-discovery resolution."  Opp'n at 7.

3           As the Court indicated at the motion hearing, it finds that the complaint alleges a design,

4    rather than a manufacturing, defect and that Plaintiffs' express warranty claims are therefore not

5    covered by the NVLW.  Hearing Tr. at 9.  While it is not entirely clear from the complaint whether

6    Plaintiffs are alleging that *all* 2019 and 2020 RAV4 Hybrid vehicles suffer from the fuel-tank

7    defect or that only some do (which would be probative of whether they were pleading design or

8    manufacturing defects),[8] Toyota is correct that the complaint focuses exclusively on Toyota's

9    decisions relating to the fuel tank's design rather than its materials or workmanship.  For example,

10   in one key section of the complaint, Plaintiffs emphasize statements in a trade publication article

11   and a television news report asserting, *inter alia*, that Toyota was "investigating a *fuel tank shape*

12   *issue* on certain RAV4 Hybrid vehicles," that "Toyota *changed the design* of its fuel tank" starting

13   with the 2019 Vehicles, and that numerous consumers were experiencing an apparent "[g]as tank

14   *design flaw*" with their Vehicles.  Compl. ¶¶ 79-81 (emphasis added).  Even more tellingly, the

15   complaint alleges that "Toyota failed to inform" each plaintiff and fellow members of each state-

16   based class "that RAV4s contain *defectively designed fuel tanks* that prevent the tank from filling

17   to capacity."  *See, e.g.*, *id.* ¶¶ 115, 162, 221 (emphasis added).  In contrast, the complaint appears

18   to lack any specific allegations that Toyota's choice of materials or the manufacturing process

19   contributed to the fuel tank defect.  The complaint also fails to allege that the fuel tanks were *not*

20   manufactured in accordance with their design.  The instant case thus differs from the authorities

21   cited by Plaintiffs in support of their express warranty claims.  *Cf. Barakezyan*, 715 Fed. Appx. at

22   762 (holding that plaintiffs adequately pled a manufacturing defect where they alleged that the

23   defective vehicles exhibited "tension relief cracks, deviating from [the manufacturer's] design");

24   *Johnson*, 272 F. Supp. 3d at 1177-78 (holding that plaintiffs adequately pled a manufacturing

25   defect where they alleged that defects in vehicles' sunroofs resulted from a "tempering process"

26   _____

27   [8] *See, e.g.*, Compl. ¶¶ 81-82 (quoting a television news segment that referred to the Vehicles'
     "design flaw," but also quoting Toyota's contemporaneous statement that "*certain* RAV4 Hybrid
28   vehicles" were affected and theorizing that "*variations* in fuel tank shape may prevent a full
     refill").

                                                      15

that "compromised" the roofs' glass).

At the motion hearing, Plaintiffs once more contended that their express warranty claims should be permitted to go forward at this early stage of the litigation. They argued that their understanding of the nature of the fuel tank defect was limited by the "asymmetry of information at play" in the case and that they might "learn a lot more about . . . the underlying defect . . . through discovery." Hearing Tr. at 6. In response, the Court ruled in favor of dismissal but noted that, "if discovery produces something that sheds a different light" on the fuel tank defect, then it would entertain a motion to amend Plaintiffs' express warranty claims pursuant to Federal Rule of Civil Procedure 15(a). *Id.* at 9.

Toyota's motion to dismiss Plaintiffs' express warranty claims under the NVLW is therefore **GRANTED** without leave to amend at this time.[9]

2.      Marketing Materials and Owner's Manuals

In addition to their claims under the NVLW, Plaintiffs charge that Toyota breached express warranties based on its representations about the Vehicles' fuel tank capacity and mileage range in marketing materials and the Vehicles' owner's manual. *See* Mot. at 14 (citing, *e.g.*, Compl. ¶¶ 3, 113, 160). As described above, a claim for breach of express warranty under U.C.C. § 2-313 (and associated statutes) requires the plaintiff to plead and prove an "affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the

---

[9] Toyota also argues that eighteen Plaintiffs' express warranty claims under the NVLW are barred because they failed "to present their vehicles to TMS for repair," as the NVLW requires. Reply at 7; *see also* Landis Decl., Exs. 2 and 4 at 16, 33 (providing, in the NVLW, that "[t]he performance of necessary repairs and adjustments is the exclusive remedy under this warranty or any implied warranty" and mandating that a customer seeking warranty service "take [her] vehicle to an authorized Toyota dealership"). Plaintiffs counter that this requirement is "excused where presentation would be futile because 'no repair would cure the defect, and no replacement would solve the problem.'" Opp'n at 7 (quoting *Galoski v. Stanley Black & Decker, Inc.*, 2015 WL 5093443, at *6 (N.D. Ohio Aug 28, 2015)). While the Court need not decide this issue because it has dismissed Plaintiffs' NVLW-based claims without leave to amend, it observes that Plaintiffs' current allegations likely fail to plead futility given the high bar that this requirement establishes. *See, e.g.*, *In re MyFord Touch Consumer Litig.*, 46 F. Supp. 3d 936, 970 (N.D. Cal. 2014) (explaining that, while "futility may, in theory, be a basis for an excuse" to an express warranty's presentment requirement, the burden in pleading the exception is a heavy one). Here, Plaintiffs allege only that Toyota did not recommend any repairs when it first acknowledged the fuel-tank issue in November 2019, Compl. ¶ 76, and that its subsequent interim fix was acknowledged to be of potentially limited value, Compl. ¶ 83. These allegations would likely fail to demonstrate that presenting the Vehicles for repairs would necessarily have been futile.

United States District Court
Northern District of California

1    bargain" or a "description of the goods which is made part of the basis of the bargain."  U.C.C.

2    § 2-313(1)(a)-(b).

3        Toyota argues that Plaintiffs' express warranty claims founded on the Vehicles' marketing

4    materials and owner's manual fail for numerous reasons.  First, Toyota asserts that statements in

5    the owner's manual cannot ground an express warranty claim since the manual merely "provides

6    directions for using or operating the Subject Vehicles and descriptions of the vehicles'

7    functions"—it "do[es] not include any 'promises' that Plaintiffs could have 'accepted,'" as

8    required by U.C.C. § 2-313.  Mot. at 14.  Second, while Toyota concedes that marketing materials

9    can sometimes ground an express warranty claim it argues that Plaintiffs here have failed to

10   "allege—other than in conclusory fashion—that they saw or otherwise relied on these marketing

11   materials in deciding whether to purchase the Subject Vehicles."  Reply at 10.  Toyota also argues

12   that claims based on the owner's manual similarly fail because Plaintiffs have not alleged that they

13   "were aware of the statements in the owner's manuals . . . before or at the time of purchase."  *Id.* at

14   9.  Third, Toyota contends that claims based on EPA mileage estimates are barred (at least under

15   California law) because such estimates, even when reiterated in advertisements, "do[] not

16   constitute an independent warranty that [a] vehicle would achieve the EPA fuel economy

17   estimates or a similar level of fuel economy."  Mot. at 15 (quoting *Paduano v. Am. Honda Motor*

18   *Co., Inc.*, 169 Cal. App. 4th 1453, 1467 (2009)); *see also* Reply at 10 (proffering the same

19   argument).

20       Plaintiffs focus on the plain text of U.C.C. § 2-313 and assert that, because "TMS markets,

21   represents, and warrants on its website and in its video advertisements that the RAV4's fuel tank is

22   14.5 gallons," it has repeatedly made an "affirmation of fact or promise . . . which relates to the

23   goods."  Opp'n at 8 (citing Compl. ¶ 47, 56).  With regard to statements in the Vehicles' owner's

24   manual, Plaintiffs point to caselaw from this District and elsewhere concluding that "promises

25   made after purchase, *such as those contained in product manuals*, constitute an 'affirmation of fact

26   or promise' if it can be fairly regarded as part of the contract."  *Id.* at 9 (quoting *Nguyen v.*

27   *Simpson Strong-Tie Co.*, 2020 WL 5371328, at *13 (N.D. Cal. Sept. 8, 2020)) (emphasis in

28   original); *see also In re Nexus 6P Prods. Liab. Litig.*, 293 F. Supp. 3d 888, 916 (N.D. Cal. 2018)

United States District Court
Northern District of California

17

1   (concluding that California law "focuses on the seller and looks to the promises and affirmations

2   that the seller made"; "The ultimate question is what the seller in essence agreed to sell") (internal

3   quotation omitted).  And while Plaintiffs do not engage with Toyota's arguments about EPA

4   mileage estimates in their opposition brief, they elsewhere point out that their essential allegation

5   is not that the Vehicles achieved fewer miles per gallon of gasoline than the EPA estimates

6   indicated.  Even though Plaintiffs' claims concern the Vehicles' "limited fuel tank capacity, which

7   necessarily results in reduced mileage range," "MPG *variability* is not at issue in the Complaint."

8   *See* Docket No. 70 at 3 (emphasis in original).

9        Regarding Toyota's contention that Plaintiffs' express warranty claims fail to the extent

10   that they are based on the EPA's MPG calculations, the Court (as it suggested at the motion

11   hearing) is not persuaded.  *See* Hearing Tr. at 14-15.  As Plaintiffs observe, this case does not turn

12   on the accuracy of EPA mileage estimates but on Toyota's representations about the capacity of

13   the Vehicles' fuel tanks.  While the Vehicles' range is, of course, a product of both fuel tank size

14   and MPG estimates, Plaintiffs' references to mileage range throughout the complaint are merely

15   illustrative, communicating the practical effects of the alleged defect (*i.e.*, more frequent refueling

16   due to the Vehicles' diminished range).  The Court thus finds that Plaintiffs' express warranty

17   claims are not precluded on the ground that the complaint incidentally refers to MPG estimates in

18   describing the fuel tank defect.

19        The Court also disagrees with Toyota's argument that statements in an owner's manual are

20   never actionable under U.C.C. § 2-313 because they do not constitute "promises."  As noted

21   above, that provision applies to any "affirmation of fact . . . made by the seller to the buyer which

22   relates to the goods" or any "description of the goods" so long as such statements also become

23   "part of the basis of the bargain."  U.C.C. § 2-313(1)(a)-(b).  While some courts have concluded

24   that "owner's manuals cannot form an express contractual obligation," *Tae Hae Lee*, 992 F. Supp.

25   2d at 978, the weight of authority (as cited by the parties) holds that they may, provided that the

26   other requirements of U.C.C. § 2-313 have been satisfied.  *See, e.g.*, *McVicar v. Goodman Glob.,*

27   *Inc.*, 1 F. Supp. 3d 1044, 1057 (C.D. Cal. 2014); *Connick v. Suzuki Motor Co., Ltd.*, 656 N.E.2d

28   170, 173, 177 (Ill. App. Ct. 1995), *rev'd in part on other grounds*, 174 Ill.2d 482 (Ill. 1996).  The

United States District Court
Northern District of California

18

1    Court therefore rejects Toyota's attempt to categorically exclude the owner's manuals from the

2    coverage of U.C.C. § 2-313 and affiliated statutes.

3         However, the owner's manual is not automatically part of the parties' contract.  The

4    question remains whether statements concerning the Vehicles' fuel tank capacity in Toyota's

5    marketing materials and the owner's manuals in fact formed "part of the basis of the bargain," as

6    the U.C.C. requires.  Toyota argues that they did not because the complaint fails to allege that

7    Plaintiffs "relied" on the statements, or that they ever "saw" or were otherwise made "aware" of

8    them.  Reply at 9-10.  As to reliance, "states are split on the question whether reliance is

9    necessary" to stating an express warranty claim.  *Nexus 6P*, 293 F. Supp. 3d at 914.  This Court

10   addressed the issue in *In re MyFord Touch Consumer Litigation*, 46 F. Supp. 3d 936 (N.D. Cal.

11   2014), and concluded that, at least with respect to express *written* warranties, consumers need not

12   plead that they were "aware of and relied on" on the warranty prior to purchasing the defective

13   products.  *Id.* at 972-73.  The Court drew attention to Comment 3 to U.C.C. § 2-313, which states

14   that "affirmations of fact made by the seller about the goods during a bargain are regarded as part

15   of the description of the goods" and that therefore "no particular reliance on such statements need

16   be shown in order to weave them into the fabric of the agreement."  *Id.* (quoting U.C.C. § 2-313,

17   cmt. 3).  The Court also "acknowledge[d] that there are a few lower court cases indicating that

18   reliance is required," but observed that many of those cases were "distinguishable because they

19   did not involve *written* warranties delivered in connection with a sale."  *Id.* at 973 (emphasis in

20   original).  Among other authorities, this Court cited *Cipollone v. Liggett Group, Inc.*, 893 F.2d

21   541, 567 (3d Cir. 1990), *rev'd in part on other grounds*, 505 U.S. 504 (1992), in which the Third

22   Circuit (construing New Jersey law) required a plaintiff to prove "that she read, heard, saw or

23   knew of [an] advertisement containing the affirmation of fact or purpose" to satisfy the basis-of-

24   the-bargain requirement.  The Third Circuit declined, however, to impose this burden where a

25   written warranty is delivered to the purchaser at or around the time of sale because, in that

26   scenario, "there is no question that the plaintiff has knowledge that the alleged warranty exists."

27   *Id.* at 568 n.29.

28         The Central District of California in *Toyota Motor Corp.* similarly distinguished between

19

United States District Court
Northern District of California

1    plaintiffs' express warranty claims based on Toyota's written warranty versus those based on its

2    advertising materials.  *See* 754 F. Supp. 2d at 1177, 1182.  In discussing the latter, the court held

3    that plaintiffs could not state an express warranty claim founded on statements in Toyota's

4    advertisements "in the absence of allegations that they were exposed to them."  *Id.* at 1182.  But

5    plaintiffs in that case "allege[d] merely that [Toyota's] statements were made in advertisements, in

6    Toyota's e-brochures, and in uniform statements provided by Toyota to be made by salespeople."

7    *Id.* (internal quotations omitted).  Therefore, because plaintiffs failed to allege "that they heard or

8    read these statements or that the statements were otherwise disseminated to them," the statements

9    did not form part of the "basis of the bargain" (at least under California's version of U.C.C. § 2-

10   313).  *Id.* at 1182-83.  In a footnote, the court further clarified that plaintiffs were "not required to

11   allege reliance" on the advertisements to state an express warranty claim.  *Id.* at 1183 n.22 (citing

12   *Weinstat v. Dentsply Intern., Inc.*, 180 Cal. App. 4th 1213, 1227 (2010)).  While the court did not

13   elaborate on the difference between adequately pleading exposure versus reliance, it concluded

14   that "California law does not permit Plaintiffs, in the absence of *specific allegations that they were*

15   *aware of the statements* made in a national advertising campaign, to base their express warranty

16   claims on statements in that national advertising campaign."  *Id.* at 1183 (emphasis added).

17         While the law on this issue remains somewhat elusive, the Court finds persuasive

18   *Cipollone* and *Toyota Motor Corp.*  These cases require that plaintiffs bringing express warranty

19   claims founded on statements in marketing materials and elsewhere outside an express written

20   warranty (*e.g.*, the NVLW) must allege that they at least heard, read, or were otherwise aware of

21   the statements to satisfy the basis-of-the-bargain requirement in U.C.C. § 2-313.  The Court finds

22   it logical that documents not formally part of the contract cannot be considered an aspect of the

23   agreement if plaintiffs never saw or had any awareness of them.

24         In the instant case, the complaint adequately alleges that Toyota represents the capacity of

25   the Vehicles' fuel tank to be 14.5 gallons in advertisements and owner's manuals.  *See* Compl. ¶¶

26   46-59.  Toyota is correct, however, that "Plaintiffs never allege—other than in conclusory

27   fashion—that they saw or otherwise relied on these marketing materials in deciding whether to

28   purchase the Subject Vehicles" or that they "were aware of the statements in the owner's manuals"

around the time of the sale.  Reply at 9-10.  Instead, the complaint contains only the boilerplate assertion that "Plaintiffs believed and relied on statements made by Toyota regarding the RAV4s' fuel tank capacity."  Compl. ¶ 4; *see also id.* ¶¶ 6-39 (stating that each Plaintiff "believed and relied upon Toyota's representations that the RAV4's fuel tank capacity was 14.5 gallons").  While the pleading standards of Rule 8 are more forgiving than those of Rule 9 (which the Court addresses below in Part IV.D.1), these allegations are not sufficiently specific to state a plausible claim for breach of contract based on these documents under *Twombly* and *Iqbal*.  In the absence of more detailed allegations concerning Plaintiffs' awareness of the statements made in the Vehicles' marketing materials and owner's manuals, Plaintiffs express warranty claims based on such statements cannot proceed.

The Court therefore **GRANTS** Toyota's motion to dismiss Plaintiffs' claims for breach of express warranty insofar as they depend on Toyota's marketing materials or the Vehicle owner's manuals.  Plaintiffs are granted leave to amend as to these materials if they can allege pre-sale awareness of them.[10]

3.     Notice

Lastly, while the Court need not reach the question here given its aforementioned resolution of Plaintiffs' express warranty claims, Toyota argues that Plaintiffs from five states have failed to satisfy the pre-suit notice requirement of state laws modeled on U.C.C. § 2-607.  That provision states that, "[w]here a tender has been accepted . . . the buyer must within a reasonable time after he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy."  U.C.C. § 2-607(3)(a).  Toyota argues that the claims of Plaintiffs residing in Idaho, Montana, North Dakota, Oregon, and Wisconsin should be dismissed because "Plaintiffs failed to allege that they gave TMS notice of the alleged breach of express warranty."[11]

---

[10] Consistent with *Toyota Motor Corp.*, 754 F. Supp. 2d at 1182-83 & 1183 n.22, Plaintiffs need not plead reliance on (as distinct from awareness of) these documents in entering into the contract.

[11] Toyota originally argued that Plaintiffs from fifteen states were barred from bringing express warranty claims by the notice requirement of U.C.C. § 2-607.  Mot. at 15.  Plaintiffs responded that "[t]he majority of these states . . . recognize that the filing of a complaint satisfies the notice requirement."  Opp'n at 10.  Toyota then withdrew their arguments with respect to Plaintiffs from ten of these states.  Reply at 10.

1    Reply at 10.  Plaintiffs counter that, with respect to these states, "individualized notice" was

2    unnecessary because "TMS had actual notice of the RAV4 defect" by at least November 2019.

3    Opp'n at 11.

4          While the state-specific caselaw cited by Plaintiffs in support of their argument is

5    somewhat inconclusive, *see id.*, Comment 4 to U.C.C. § 2-607 provides that notification under

6    that provision "need merely be sufficient to let the seller know that the transaction is still

7    troublesome and must be watched."  U.C.C. § 2-607, cmt. 4.  The buyer need not notify the seller

8    of "all the objections that will be relied on" to save "the buyer's rights under this section," nor

9    need the buyer notify the seller that he is pursuing "a claim for damages" or "any threatened

10   litigation or other resort to a remedy."  *Id.*  Instead, the notification "need only be such as informs

11   the seller that the transaction is claimed to involve a breach."  *Id.*; *see also id.* (stating that "the

12   rule of requiring notification is designed to defeat commercial bad faith, not to deprive a good

13   faith consumer of his remedy").  As will be explained below in greater detail, *infra* Part IV.D.1,

14   the Court finds that Plaintiffs have plausibly pled that Toyota had actual knowledge of the fuel

15   tank defect by early 2019.  At a minimum, the complaint alleges (and Toyota does not dispute)

16   that the company issued a "Tech Tip" regarding the defect to service providers in November 2019.

17   Compl. ¶ 76.  It is therefore reasonable to infer that Toyota had notice that the Vehicle sales were

18   "troublesome" and needed to "be watched" by the time Plaintiffs' action was originally filed in

19   January 2020, as Comment 4 to U.C.C. § 2-607 requires.  *See In re Rust-Oleum Restore Mktg.,*

20   *Sales Practices and Prods. Liab. Litig.*, 155 F. Supp. 3d 772, 799-800 (N.D. Ill. 2016) (stating that

21   the notice requirement of U.C.C. § 2-607 does not apply "when the seller had actual knowledge of

22   the defect of the particular product" and denying a motion to dismiss express warranty claims

23   where plaintiffs alleged, *inter alia*, that the defendant "had notice of consumer complaints for

24   years").

25         As a result, to the extent that Toyota moves to dismiss the express warranty claims on the

26   grounds that the Idaho, Montana, North Dakota, Oregon, and Wisconsin Plaintiffs failed to satisfy

27   U.C.C. notice requirements, that aspect of the motion is **DENIED**.

28

United States District Court
Northern District of California

C.      Implied Warranty of Merchantability Claims

        Plaintiffs bring claims for breach of the implied warranty of merchantability in all states in

which they reside.  With one exception, all of these claims are based on U.C.C. § 2-314 and that

provision's adaptation in various state statutes.[12]  The U.C.C. provides that ''a warranty that the

goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with

respect to goods of that kind'' and that, in order to be "merchantable," goods "must be at least

such as . . . are *fit for the ordinary purposes* for which such goods are used.''  U.C.C. § 2-314(1),

(2)(c) (emphasis added).  To state a claim for breach of the implied warranty of merchantability,

therefore, a plaintiff must generally plead that "the product did not possess even the most basic

degree of fitness for ordinary use."  *Mocek v. Alfa Leisure, Inc.*, 114 Cal. App. 4th 402, 406

(2003).  The gravamen of Plaintiffs' claims here is that, because of the fuel tank defect, the

Vehicles "were not in merchantable condition" at the time of sale or lease "and are not fit for the

ordinary purpose for which vehicles are used."  *See, e.g.*, Compl. ¶ 124, 172, 231.

        In its motion to dismiss, Toyota argues that Plaintiffs' implied warranty claims fail because

"they do not allege facts [showing] that their vehicles are unmerchantable or unfit for their

ordinary purpose."[13]  Mot. at 15-16.  Toyota cites to numerous cases involving defective

automobiles which conclude that the implied warranty of merchantability requires that vehicles

possess only "a minimum level of quality."  *See Tae Hae Lee*, 992 F. Supp. 2d at 979 (quoting

*Am. Suzuki Motor Corp. v. Superior Court*, 37 Cal. App. 4th 1291, 1295-96 (1995)).  In *Tae Hae

Lee*, for example, the court rejected claims that Toyota breached the implied warranty of

merchantability by failing to "provide effective braking in unavoidable front-end collisions."  *Id.*

Holding such allegations insufficient to state a claim, the court asserted that "the basic inquiry" in

such cases simply "whether the vehicle was fit for driving."  *Id.* at 980; *see also Carlson v. Gen.*

---

[12] *See, e.g.*, Compl. ¶¶ 175-86 (alleging violations of California's Song-Beverly Consumer Warranty Act, Cal. Civ. Code § 1790 *et seq.*).

[13] Toyota further argues that several Plaintiffs' implied warranty claims fail for the independent reason that "they lack privity with TMS under applicable state law."  Mot. at 16.  The parties also reiterate their positions regarding five Plaintiffs' satisfaction of the notice requirement under U.C.C. § 2-607, which they raised in the context of the express warranty claims.  *See* Reply at 13; Opp'n at 14.  For the following reasons, the Court need not address these issues.

United States District Court
Northern District of California

*Motors Corp.*, 883 F.2d 287, 297 (4th Cir. 1989) (stating that "where a car can provide safe, reliable transportation, it is generally considered merchantable"). Even more to the point, the court in *Gertz I* held that "a car which is able to hold 6, 8, or 10 gallons of fuel . . . and which is able to travel, at minimum, 300 miles on a tank of gas" is fit for its ordinary purpose. 2011 WL 13142144 at *12; *see also Troup v. Toyota Motor Corp.*, 545 Fed. Appx. 668, 669 (9th Cir. 2013) (affirming the district court's dismissal of an implied warranty claim in *Gertz II* where "the alleged defect did not compromise the vehicle's safety, render it inoperable, or drastically reduce its mileage range" but merely "required [plaintiffs] to refuel more often"). Toyota thus presses the straightforward argument that because "Plaintiffs concede that their vehicles travel 330-480 miles on a tank of gas" and do not allege other operability problems, their implied warranty claims must fail. *See* Mot. at 16-17.

In their opposition brief, Plaintiffs rely on language from this Court stating that "to be fit for its ordinary purpose a vehicle must be . . . substantially free of defects" and must do more than merely "provide[] transportation from point A to point B." Opp'n at 11-12 (quoting *MyFord Touch*, 291 F. Supp. 3d at 945-46). It is true that in previous defective automobile cases, this Court has allowed implied warranty claims to proceed beyond the pleading stage where there was a factual question regarding a vehicle's safety. In *MyFord Touch*, where plaintiffs alleged various safety risks associated with a malfunctioning "infotainment" system, the Court noted that "the ordinary purpose of a car is not just to provide transportation but rather safe, reliable transportation." 46 F. Supp. 3d at 980. There, the Court denied the defendant's motion to dismiss because there was "a question of fact for the jury as to whether the problems with [system] posed enough of a safety risk that the cars" were not merchantable. *Id.* at 980. Similarly, in *Sloan*, 287 F. Supp. 3d 840 (N.D. Cal. 2018), the Court rejected the defendant's argument "that a vehicle is fit for ordinary use so long as it continues to provide transportation, irrespective of safety concerns." *Id.* at 879. Instead, plaintiffs' allegations "of engine damage, fouled spark plugs, engine misfires, emission of white smoke, and so" raised "a question of fact for the jury" as to whether plaintiffs' vehicles were fit for their ordinary purpose. *Id.* The Court's ruling in both cases was therefore tied to material questions of vehicle safety.

24

United States District Court
Northern District of California

Here, in contrast, Plaintiffs' allegations do not raise a serious question of the Vehicles' fitness for reasonably safe and reliable transportation, as they did in *MyFord Touch* and *Sloan*. Plaintiffs ineffectually attempt to distinguish the instant case from *Gertz I*, arguing that the Vehicles' fuel-tank defect is perpetual whereas the comparable defect in the earlier case "manifested *only* in cold weather." Opp'n at 12 (emphasis in original); *see also* Hearing Tr. at 11-12 (arguing that this case involves "a pervasive defect" whereas *Gertz I* involved "an intermittent defect"). As Toyota points out, however, the Vehicles' purportedly diminished mileage range here is superior to that in *Gertz I*: In the earlier case, plaintiffs alleged that they were "able to travel, at minimum, 300 miles on a tank of gas," 2011 WL 13142144 at *12, whereas in the instant case Plaintiffs acknowledge that they "are able to travel 330-480 miles on a tank of gas," Mot. at 17. As in *Troup*, the complaint fails to demonstrate that the defect "compromise[s] the vehicle's safety, render[s] it inoperable, or drastically reduce[s] its mileage range"; "rather, it merely require[s] the [Plaintiffs] to refuel more often." 545 Fed. Appx. at 669. "Absent more, the complaint fails to state a claim for breach of the implied warranty of merchantability." *Id.*

The Court therefore finds, as it ruled at the motion hearing, that Plaintiffs have failed to state an implied warranty claim. *See* Hearing Tr. at 13-14. Toyota's motion to dismiss on this basis is **GRANTED**. Because amendment would be futile at this stage, Plaintiffs do not have leave to amend.

D.     Consumer Protection Claims: General Issues

Plaintiffs have brought claims under the consumer protection (and/or unfair competition) statutes of all twenty-eight states in which they reside. They allege that Toyota made affirmative misrepresentations about the Vehicles' fuel tank capacity and that the company unlawfully failed to disclose the alleged fuel tank defect to consumers. In other words, Plaintiffs' consumer protection claims are based on both an affirmative misrepresentation and an omission (or duty to disclose) theory of liability. *See* Hearing Tr. at 22. In their briefs, the parties first addressed overarching issues relating to Plaintiffs' allegations of consumer protection violations; they then discussed issues particular to different states' statutory requirements. The Court follows the parties' lead and addresses these issues in turn.

25

United States District Court
Northern District of California

1    In its motion to dismiss, Toyota argues that "Plaintiffs' fraud and consumer protection

2 theories fail" for three reasons.  First, "a claim based on the use of EPA estimates in

3 advertisements and other materials is preempted by federal law."  *Id.* at 20.  Second, Plaintiffs'

4 "allegations do not meet Rule 9(b)'s heightened pleading standard since "they do not identify any

5 specific advertisement or untruthful representation by TMS that they relied on" in purchasing the

6 Vehicles.  *Id.* at 19-20.  Third, "Plaintiffs' allegations of presale knowledge and active

7 concealment" as part of their omission theory are "unsupported by factual allegations" and "belied

8 by Plaintiffs' own allegations."  *Id.* at 21.  Plaintiffs respond that their "allegations regarding

9 TMS's fraudulent misrepresentations are sufficiently particularized to state a claim for relief"

10 under Rule 9(b), as are their "allegations regarding TMS's knowledge of the fuel tank defect" at

11 the time the Vehicles were sold.  Opp'n at 15-16.  Plaintiffs do not specifically address Toyota's

12 preemption argument in their opposition brief.

13    The Court addresses the preemption and affirmative misrepresentation arguments in the

14 first subsection below, and the omission arguments in a second subsection.

15        1.    Affirmative Misrepresentation Theory

16            a.    Preemption

17    In arguing that Plaintiffs' consumer protection claims are barred by preemption principles,

18 Toyota raises a procedural as well as a substantive argument.  Toyota contends that Plaintiffs'

19 failure to respond to its preemption argument constitutes waiver, and that "any consumer

20 protection claim based on the MPG estimates used in TMS's marketing materials should be

21 dismissed."  Reply at 14 (citing, *e.g.*, *Shakur v. Schriro*, 514 F.3d 878, 892 (9th Cir. 2008)).

22 While Plaintiffs declined, for unclear reasons, to address the issue in their opposition brief,

23 Plaintiffs did argue elsewhere (as the Court noted when discussing their express warranty claims

24 in Part IV.B.2) that their "claims for relief are predicated on TMS's misrepresentations and

25 omissions regarding the RAV4's 14.5 gallon fuel tank capacity," not the EPA's MPG estimates.

26 Docket No. 70 at 3.  Plaintiffs therefore asserted that even though the fuel tank defect "necessarily

27 results in [a] reduced mileage range," "MPG *variability* is not at issue in the Complaint."  *Id.*

28 (emphasis in original).  The Court concludes that this argument provides a sufficient basis for

resolving the issue.

As to the merits of the preemption question, the Court indicated at the motion hearing that it finds Toyota's argument unconvincing.  Hearing tr. at 14-15.  Toyota contends that a fraudulent misrepresentation claim "based on the use of EPA estimates in advertisements and other materials is preempted by federal law," namely "applicable Federal Trade Commission regulations and the Energy Policy and Conservation Act ["EPCA"], 49 U.S.C. § 321901 *et seq.*"[14]  Mot. at 20. Toyota cites *Sanchez v. Ford Motor Co.*, 2014 WL 2218278 (D. Colo. May 29, 2014), which explains that federal law requires automobile manufacturers to include EPA mileage estimates (and certain disclaimers) in marketing materials when the manufacturers reference MPG figures. *Id.* at *3-4.  The court in that case rejected a plaintiff's state-law claims that "that the EPA estimates" in an MPG-focused advertising graphic "were inherently deceptive" and "failed to comply with federal regulations" on preemption grounds.  *Id.* at *4.  There, however, the plaintiff's claims were based on his vehicle's alleged failure to "achieve the advertised fuel efficiency."  *Id.* at *2.  Here, in contrast, Plaintiffs do not allege that their Vehicles' failure to obtain Toyota's advertised mileage range is a function of deceptive MPG estimates but of diminished fuel tank capacity.  *Sanchez* is therefore inapposite: Preemption based on allegedly false claims about fuel efficiency (*i.e.*, a vehicle's MPG rating) simply does not apply to this case, which, as noted above, is not predicated on such claim.

Moreover, *In re Ford Fusion and C-Max Fuel Economy Litigation*, 2015 WL 7018369 (S.D.N.Y. Nov. 12, 2015), the other case that Toyota relies on for its preemption argument, does not stand for the broad principle that "a claim based on the use of EPA estimates in advertisements and other materials is preempted by federal law," as Toyota suggests.  *See* Mot. at 20.  The *Ford Fusion* court addressed Ford's argument "that any [state-based] false advertisement claims based

_____

[14] The Supremacy Clause of the U.S. Constitution "invalidates state laws that 'interfere with, or are contrary to,' federal law."  *Hillsborough Cty. v. Automated Med. Labs., Inc.,* 471 U.S. 707, 712 (1985); *see also* U.S. Const. art. VI, ¶ 2.  "State action may be foreclosed by express language in a congressional enactment, by implication from the depth and breadth of a congressional scheme that occupies the legislative field, or by implication because of a conflict with a congressional enactment."  *Lorillard Tobacco Co. v. Reilly,* 533 U.S. 525, 531 (2001) (internal quotations omitted).

on advertisements that contain federally-mandated [fuel economy] disclosure language" are preempted by federal law.  *Id.* at *24.  Plaintiffs countered that state consumer protection laws "are not based on the disclosure of fuel economy or fuel operating costs, but rather are based on the more general duty not to deceive," which may be violated when manufacturers go "beyond the mere disclosure of EPA estimates."  *Id.*  The court agreed with the plaintiffs, observing that "false advertisement claims based on fuel economy are not, in all forms, expressly preempted by" federal laws such as the EPCA.  *Id.* at *26.  It specifically cited California decisions that it found "particularly persuasive on this point," and which hold that federal law "cannot be construed to encompass the general duty not to make fraudulent or misleading statements."  *Id.* (quoting *Paduano*, 169 Cal. App. 4th at 1477-78).  The *In re Ford Fusion* court thus concluded that "any allegations that go beyond the mere disclosure—with appropriate caveats—of the estimated fuel economy of the Vehicles, go beyond the scope of the EPCA."  *Id.*  In the instant case, Plaintiffs argue that Toyota's advertisements concerning the Vehicles' mileage ranges are deceptive because they are based on misrepresentations about fuel tank capacity, not MPG calculations.  These allegations clearly "go beyond the mere disclosure . . . of the estimated fuel economy of the Vehicles."  *See id.*

The Court therefore rejects Toyota's preemption argument and **DENIES** its motion to dismiss on that ground.

     b. <u>Rule 9(b) Sufficiency</u>

Toyota's challenge to the sufficiency of Plaintiffs' affirmative-misrepresentation allegations, however, is more persuasive.  The parties do not dispute that because Plaintiffs' consumer protection claims sound in fraud they are governed by the heightened pleading standard of Rule 9(b).  *See* Mot. at 19-20, Opp'n at 15.  That standard, as noted above, requires plaintiffs to "state with particularity the circumstances constituting fraud," Fed. R. Civ. P. 9(b), and specify "the who, what, when, where, and how" of a defendant's misconduct, *Vess,* 317 F.3d at 1106. Plaintiffs assert that their allegations regarding Toyota's misrepresentations are "sufficiently particularized to state a claim for relief" under Rule 9(b):

    Plaintiffs allege (a) the specific *places* that TMS made the false and

misleading statements (on its website, in the owner's manual, and in specifically identified advertisements); (b) the specific *reasons* that the statements were false and misleading (TMS represented that RAV4s had 14.5 gallon fuel tanks, when their true capacity was 8-11 gallons); (c) that TMS's statements were made at the time of sale or lease of the RAV4s and continue to be made today; and (d) that these statements falsely represented the size of the RAV4 fuel tank and failed to disclose that a defect prevents the tank from filling to capacity.

Opp'n at 15 (citing Compl. ¶¶ 47, 50, 56, 62).  Toyota counters that, despite Plaintiffs' "allegations about Toyota's marketing materials . . . and specifications in the owner's manual," "they do not identify any specific advertisement or untruthful representation by TMS that they relied on regarding the estimated mileage range of the vehicles."  Mot. at 19-20 (emphasis removed).

As the Court stated at the motion hearing, it finds that Plaintiffs' affirmative misrepresentation claims have not been pled with adequate specificity to survive a motion to dismiss under Rule 9(b).  Hearing Tr. at 32.  Toyota is correct that "[w]hile Plaintiffs point to advertisements they allege to be misleading, they never allege that [they] actually saw those advertisements, nor do they allege when they saw these advertisements, and which portions of the advertisements they found material."  Reply at 14.  As the Court explained with respect to Plaintiffs' express warranty claims based on Toyota's marketing materials and the Vehicle owner's manuals, the complaint simply states that Plaintiffs "believed and relied upon Toyota's representations that the RAV4s' fuel tank capacity was 14.5 gallons."  *See, e.g.*, Compl. ¶ 6.  This wholly conclusory assertion is insufficient to state a breach of warranty claim under Rule 8 and it is even more deficient for purposes of Rule 9.  Plaintiffs conceded at the hearing, moreover, that the complaint lacks any more specific allegations about which advertisements Plaintiffs were exposed to and whether they relied on them in deciding to purchase the Vehicles.  Hearing Tr. at 21.  While the complaint adequately alleges that Toyota's misleading advertisements *exist* (and Toyota acknowledged that the company lists the Vehicles' fuel tank capacity as 14.5 gallons in sales brochures and perhaps "in some advertisements," *id.* at 20), the complaint fails to establish that Plaintiffs saw, heard, or acted on them.

Toyota's motion to dismiss Plaintiffs' consumer protection claims based on an affirmative

United States District Court
Northern District of California

1    misrepresentation theory is therefore **GRANTED** insofar as (1) the applicable statutes require that

2    plaintiffs knew of and/or relied on the alleged misrepresentations and (2) the complaint fails to

3    identify those misrepresentations known to and/or relied on by plaintiffs with any specificity.

4    Since the parties have not briefed the issue of the statutes' reliance requirements, the Court

5    declines to rule on Plaintiffs' claims on a state-by-state basis at this time.[15]

6            2.      Omission Theory

7            Toyota next argues that Plaintiffs' omission-based consumer protection claims generally

8    fail because they have not established that Toyota had knowledge of the fuel tank defect at the

9    time the Vehicles were sold.  *See, e.g.*, *Sloan*, 287 F. Supp. 3d at 865 ("To be liable for a failure to

10   disclose, a defendant must have pre-sale knowledge of the defect.").  "Plaintiffs claim that TMS

11   knew of the alleged fuel tank defect before they purchased their vehicles, and either had a duty to

12   disclose or actively concealed the defect from them."  Mot. at 21.  Toyota argues, however, that

13   Plaintiffs' allegations of TMS's knowledge of the defect are either too conclusory to satisfy Rule

14   9(b) or speciously rely on undated consumer complaints to establish such knowledge.  *Id.* at 21-

15   22.  As Toyota points out, Plaintiffs specifically allege only that Toyota became aware of the

16   defect in November 2019, which "post-dates the purchase or lease of the vehicle[s]" for twenty-six

17   of the thirty-six total Plaintiffs.  *Id.* at 22-23 (emphasis removed).  Alternatively, Toyota argues

18   that, assuming it knew of the defect prior to November 2019, Plaintiffs nevertheless fail to show

19   "that there was any period of time that TMS both knew of the alleged defect *and* had exclusive

20   knowledge of it."  *Id.* at 24.  And because exclusive knowledge is typically an element of a

21   consumer protection claim based on a duty to disclose, Toyota contends, Plaintiffs cannot ground

22   such claims on a breach of that duty absent specific allegations directed thereto.  *See id.*  Finally,

23   Toyota asserts that Plaintiffs "fail to identify a single act of concealment"—another common

24   foundation for establishing a duty to disclose in consumer protection statutes.  *Id.*  Any claims

25   asserted by Plaintiffs that require a showing of active concealment should therefore be dismissed,

26

27   ───────────────

[15] *See In re Chrysler-Dodge-Jeep Ecodiesel Mktg., Sales Practices, and Prods. Liab. Litig.*, 295 F.
28   Supp. 3d 927, 1015 n.21 (N.D. Cal. 2018) (collecting cases indicating that reliance is not required under numerous states' consumer protection statutes).

United States District Court
Northern District of California

according to Toyota.

Plaintiffs respond that omission-based claims, although formally governed by Rule 9(b), do not require "the same level of specificity required by a normal fraud claim" because a "plaintiff cannot point out the specific moment when the defendant failed to act." Opp'n at 15 (quoting *Corson v. Toyota Motor Sales, U.S.A., Inc.*, 2013 WL 10068136, at *5 (C.D. Cal. July 18, 2013)). Plaintiffs therefore argue that their allegations that Toyota fraudulently "omitted that the RAV4s contain a defect which prevents the fuel tank from filling to the advertised capacity" are adequately pled. *Id.* at 16. As to the question of Toyota's presale knowledge, Plaintiffs point to "a number of specific facts establishing TMS's knowledge of the defect," starting with Toyota's November 2019 "Tech Tip" to its service providers and continuing with the company's acknowledgment of the defect to a Dallas-area television station in February 2020. *Id.* at 16 (citing, *e.g.*, Compl. ¶¶ 62-83). Plaintiffs also refer to the 200-plus (undated) NHTSA complaints mentioned and excerpted in the complaint. *Id.* (citing Compl. ¶¶ 65-69). And while Plaintiffs acknowledge that "some of [them] purchased or leased their vehicles prior to the Tech Tip," they argue that the bulletin's dissemination "suggests that TMS was aware of the fuel tank issue for at least some period of time prior to its issuance." *Id.* at 17. "At the very least, TMS's arguments about when it had knowledge of the defect raise questions of fact" that should be resolved in Plaintiffs' favor on a motion to dismiss. *Id.*

Regarding the sufficiency of the allegations, Plaintiffs have satisfied the (somewhat relaxed) Rule 9(b) standard for establishing Toyota's exclusive knowledge of the fuel tank defect as part of their omission-based claims. As noted above, the pleading standard for omission-based claims differs from the stringent test governing affirmative-misrepresentation claims. *See* Part III.C, *supra*. And unlike Plaintiffs' affirmative misrepresentation claims, which depended on boilerplate allegations that they believed and relied on Toyota's deceptive marketing materials, Plaintiffs point to numerous specific indications that Toyota knew of the defect prior to the filing of the original complaint in January 2020. These include the November 2019 technical service bulletin and the December 2019 report in *Automotive News* in which Toyota confirmed the defect's existence. *See* Compl. ¶¶ 75-80. Plaintiffs' omission-based claims are therefore pled

31

United States District Court
Northern District of California

1    with the requisite specificity.

2        The question of whether Plaintiffs' have adequately alleged that Toyota had *presale*

3    knowledge of the defect presents a closer question.  As the authorities cited by the parties indicate,

4    this type of inquiry is case-specific, and courts have come to different conclusions in broadly

5    similar circumstances.  *Compare, e.g.*, *Wilson v. Hewlett-Packard Co.*, 668 F.3d 1136, 1147 (9th

6    Cir. 2012) (holding that a district court did not err in finding that plaintiffs failed to plead presale

7    knowledge of a product defect by relying on fourteen customer complaints, twelve of which were

8    undated and two of which were made more than two years after the products were purchased) *with*

9    *MacDonald v. Ford Motor Co.*, 37 F. Supp. 3d 1087, 1093-94 (N.D. Cal. 2014) (finding that

10   plaintiffs' plausibly pled that Ford knew about defective car components at the time of sale where

11   it issued technical service bulletins "five and nine months after the last relevant purchase in th[e]

12   case, and less than two years after the first purchase").  This Court has twice addressed

13   comparable issues and ruled against dismissal where plaintiffs raised a reasonable inference that

14   car manufacturers had the requisite presale knowledge to state a consumer protection claim.  In

15   *MyFord Touch*, the Court found it plausible that Ford's issuance of a service bulletin "only a few

16   months after the rollout" of vehicles with an allegedly defective feature demonstrated its

17   knowledge of the defect at the time of purchase, a finding that was further substantiated by

18   consumers' NHTSA complaints beginning several months after the rollout.  *See* 46 F. Supp. 3d at

19   958.  In *Sloan*, the Court likewise found that two service bulletins "issued relatively early in the

20   Class Period in mid-2010 and early-2011" made it reasonable to infer that GM had presale

21   knowledge of an alleged defect as to all 2010 vehicle purchasers.  *See* 287 F. Supp. 3d at 866.

22        Similarly, Plaintiffs' allegations here are sufficient to raise the reasonable inference that

23   Toyota had presale knowledge of the fuel tank defect.  The majority of Plaintiffs purchased or

24   leased their Vehicles in mid-2019, with the earliest dated purchases or leases occurring in early

25   April 2019.  *See* Opp'n at 4-6 (citing Compl. ¶ 16).  This means that, for Plaintiffs to plead presale

26   knowledge, Toyota must have been aware of the fuel-tank defect approximately seven months

27   before issuing the November 2019 bulletin.  While the Court may harbor "some doubts whether

28   Plaintiffs will actually be able to prove [as much], that does not mean Plaintiffs' case is

32

United States District Court
Northern District of California

1    implausible." *MyFord Touch*, 46 F. Supp. 3d at 958.  Further, the conclusion that Toyota knew of

2    the defect at or around the time of sale finds support in the "more than 200 complaints [that] ha[d]

3    been filed" with NHTSA and posted to other websites as of September 2020, when the amended

4    class action complaint was filed.  *See* Compl. ¶¶ 65-69.  While these customer protests are undated,

5    and so of limited value in demonstrating Toyota's knowledge of the defect in early 2019, it is at

6    least plausible that many of them were submitted in early 2019 and that Toyota was aware of

7    them.

8          Moreover, because presale knowledge will be possessed, almost by definition, only by the

9    seller and not the consumer, it is also plausible that Toyota had *exclusive* knowledge of the fuel

10   tank defect at or around the time Plaintiffs purchased their Vehicles.  *See MyFord Touch*, 46 F.

11   Supp. 3d at 960 (noting that "the presence of information online does not automatically defeat

12   exclusive knowledge" and that "exclusivity is analyzed in part by determining whether the

13   defendant has superior knowledge").  Again, although Rule 9(b) imposes a higher pleading

14   standard than Rule 8, it specifically provides that "intent, knowledge, and other conditions of a

15   person's mind may be alleged generally."  *See* Fed. R. Civ. P. 9(b).  This relaxed standard allows

16   Plaintiffs to plead exclusive knowledge through the somewhat generalized allegations in the

17   complaint.

18         The Court therefore finds that Plaintiffs have adequately alleged Toyota's exclusive

19   knowledge of the defect at the time of sale as part of their omission-based consumer protection

20   claims.  To the extent that Toyota's motion to dismiss is based on applicable statutes' requirement

21   of such exclusive knowledge, the motion is **DENIED**.

22         Toyota is correct, however, that the complaint fails to allege that the company engaged in

23   active concealment with respect to the fuel tank defect.  *See* Reply at 14-15.  While the complaint

24   repeats the language of each state's consumer protection statute in stating, for example, that

25   Toyota "engaged in unlawful trade practices by employing deception, deceptive acts or practices,

26   fraud, misrepresentations, or concealment, [or] suppression or omission of any material fact with

27   intent that others rely upon such concealment," Compl. ¶ 98, it fails to allege facts that would

28   plausibly support such boilerplate assertions.

33

1    Plaintiffs' omission-based consumer protection claims are therefore barred insofar as they

2    require a showing of active concealment.  Toyota's motion to dismiss is **GRANTED** on this

3    ground.

4    E.    Consumer Protection Claims: State-Specific Issues

5    Toyota next argues that, in addition to the global issues it identifies regarding Plaintiffs'

6    consumer protection claims, the complaint "fail[s] to sufficiently plead additional elements

7    required to sustain their state-specific claims."  Opp'n at 24.  The parties have grouped these

8    narrower issues into thirteen categories.  The Court addresses each in turn.

9    1.    California (Duty to Disclose)

10    The California Plaintiffs bring claims under the state's Consumer Legal Remedies Act

11    ("CLRA"), Cal. Civ. Code § 1750 *et seq.* (Count 4), Unfair Competition Law ("UCL"), Cal. Bus.

12    & Prof. Code § 17200 *et seq.* (Count 9), and False Advertising Law ("FAL"), Cal. Bus. & Prof.

13    Code § 17500 *et seq.* (Count 5).

14    The CLRA forbids "unfair methods of competition and unfair or deceptive acts or practices

15    undertaken by any person in a transaction intended to result or which results in the sale or lease of

16    goods or services to any consumer."  Cal. Civ. Code § 1770(a).  The CLRA prohibits twenty-four

17    enumerated acts, including "[r]epresenting that goods or services have . . . characteristics . . . or

18    qualities which they do not have" and "[r]epresenting that goods or services are of a particular

19    standard, quality, or grade . . . if they are of another."  *Id.* § 1770(a)(5), (7).

20    The UCL prohibits "unlawful, unfair[,] or fraudulent business act[s] or practice[s]," as well

21    as "unfair, deceptive, untrue or misleading advertising."  Cal. Bus. & Prof. Code § 17200.  "A

22    plaintiff may pursue a UCL claim under any or all of three theories: the 'unlawfulness,'

23    'fraudulent,' or 'unfairness' prongs."  *Toyota Motor Corp.*, 754 F. Supp. 2d at 1175.  The unlawful

24    prong bars "practices that are forbidden by any [other] law."  *Id.*  The fraudulent prong bars

25    practices that are "likely to deceive the public."  *Id.*  The unfair prong bars conduct

26    that "significantly threatens or harms competition."  *Id.* (internal quotation omitted).

27    The FAL prohibits "any statement" that is "untrue or misleading" and made "with the

28    intent directly or indirectly to dispose of" property or services.  Cal. Bus. & Prof. Code § 17500.

United States District Court
Northern District of California

1    "To state a claim for an FAL violation, Plaintiffs must allege that 'members of the public are

2    likely to be deceived.'"  *Toyota Motor Corp.* 754 F. Supp. 2d at 1176 (quoting *In re Tobacco II*

3    *Cases,* 46 Cal.4th 298, 312 (2009)).

4         As this brief summary suggests, the statutory scheme of California's consumer protection

5    laws is complex.  While the CLRA, UCL, and FAL proscribe much of the same conduct, the

6    statutes sometimes have distinct requirements.  *Compare, e.g.*, *Khan v. Medical Bd.*, 12 Cal. App.

7    4th 1834, 1846 (1993) (holding that the FAL "can be violated through negligence") *with Comm.*

8    *on Children's Television, Inc. v. Gen. Foods Corp.*, 35 Cal.3d 197, 211 (1983) (indicating that,

9    under the fraudulent prong, the UCL requires only a showing "that members of the public are

10   likely to be deceived" and so does not entail a scienter requirement).  The parties, however, have

11   not addressed such potentially disparate elements as scienter, reliance, or damages, or the remedies

12   available under each statute.  Instead, they have devoted a significant amount of space to, for

13   example, describing the "three possible tests for defining 'unfair' practices" under the unfairness

14   prong of the UCL.  *See* Mot. at 26, Opp'n at 19-21.  Even here, though, the parties do not provide

15   clear explanations about which test should apply or why.  Given the parties' piecemeal analysis of

16   these and other issues regarding the California Plaintiffs' consumer protection claims, the Court

17   focuses here on the question the parties addressed at greatest length in their briefs and at the

18   motion hearing—namely, whether Toyota had a duty to disclose the fuel tank defect, as Plaintiffs'

19   omission-based claims require.

20        Plaintiffs are correct that caselaw on the scope of a defendant's duty to disclose in

21   omission-based consumer protection cases is marked by "general disarray."  *See id.* at 17; *see also*

22   Hearing Tr. at 24-26 (discussing doctrinal confusion on the duty to disclose in these cases).

23   California appellate courts have held that "a claim may be stated" under the CLRA, UCL, and

24   FLA "in terms constituting fraudulent omissions" so long as the omission is "contrary to a

25   representation actually made by the defendant" or the omission is "of a fact the defendant was

26   obliged to disclose."  *Daugherty v. Am. Honda Motor Co., Inc.*, 144 Cal. App. 4th 824, 835

27   (2006).  In other words, an omission-based consumer protection claim may be based either on a

28   defendant's partial misrepresentation or pure omission.  *See Hodson v. Mars, Inc.*, 891 F.3d 857,

United States District Court
Northern District of California

1    860-64 (9th Cir. 2018) (distinguishing between "pure omission cases," on the one hand," and

2    "partial misrepresentation case[s]," on the other).

3            Courts have not agreed, however, on a single test that encompasses the entire universe of

4    omission-based claims.  In *LiMandri v. Judkins*, 52 Cal. App. 4th 326 (1997), the California court

5    of appeals stated that

6                There are four circumstances in which nondisclosure or concealment
             may constitute actionable fraud: (1) when the defendant is in a
7            fiduciary relationship with the plaintiff; (2) when the defendant had
             exclusive knowledge of material facts not known to the plaintiff; (3)
8            when the defendant actively conceals a material fact from the
             plaintiff; and (4) when the defendant makes partial representations
9            but also suppresses some material facts.

10    *Id.* at 336 (internal quotation omitted).  This passage is sometimes taken to delineate the full range

11    of scenarios in which a seller's duty to disclose arises.  *See, e.g.*, *Falk*, 496 F. Supp. 2d at 1094-95;

12    *see also* Mot. at 25, Opp'n at 18 (agreeing that *LiMandri* governs whether Toyota had a duty to

13    disclose in this case).

14            More recent cases have concluded, however, that sellers also have a duty to disclose

15    physical product defects in pure-omission cases where those defects create a safety hazard or

16    affect the product's central functionality.  In *Wilson*, the Ninth Circuit held that for an omission

17    relating to a product defect to be actionable (*i.e.*, "material") under the CLRA and UCL it had to

18    "cause[] an unreasonable safety hazard."  668 F.3d at 1142-43.  The *Wilson* court thus interpreted

19    the *LiMandri* test's materiality standard as requiring that a defective product "pose safety

20    concerns," at least in pure omission cases.  In *Hodson*, however, plaintiffs asked the Ninth Circuit

21    to reconsider *Wilson*'s holding in light of intervening state-court decisions in *Collins v.*

22    *eMachines, Inc.*, 202 Cal. App. 4th 249 (2011), and *Rutledge v. Hewlett-Packard Co.*, 238 Cal.

23    App. 4th 1164 (2015).  *See Hodson*, 891 F.3d at 861-62.  The *Hodson* court concluded that *Collins*

24    and *Rutledge* had "cast doubt on whether *Wilson*'s safety-hazard requirement applies in all

25    circumstances"; the court nevertheless decided the case "without either relying on or overruling

26    *Wilson*."  *Id.*  In doing so, it interpreted *Collins* and *Rutledge* as sanctioning an omission-based

27    consumer protection claim where "the allegedly concealed *physical* defect [is] *central* to the

28    product's function."  *Id.* at 864 (emphasis in original).

*United States District Court*
*Northern District of California*

36

United States District Court
Northern District of California

1    Notably, the *Hodson* court left the relationship between *LiMandri* and the Ninth Circuit's

2    decisions in *Wilson* and *Hodson* somewhat ambiguous. Specifically, the court did not make clear

3    whether it construed *Collins* and *Rutledge* (1) as requiring plaintiffs to "allege one of the four

4    *LiMandri* factors" *in addition to* a safety hazard or an effect on central product functionality to

5    state a pure-omission claim, or (2) as permitting plaintiffs to plead an actionable omission on the

6    basis of *either* one of the *LiMandri* factors *or* by alleging a safety hazard or defect to central

7    product functionality. *See id.* at 863. In other words, the *Hodson* court left unclear whether the

8    safety hazard and central functionality tests should be understood as ways of defining materiality

9    for purposes of *LiMandri* or whether these tests represent independent means of pleading an

10   omission, separate from *LiMandri*. The *Hodson* court did suggest, however, that the safety hazard

11   and central functionality tests might not apply to partial-misrepresentation (rather than pure-

12   omission) cases. The court cited *Gutierrez v. CarMax Auto Superstores California*, 19 Cal. App.

13   5th 1234 (2018), which held that a car dealership had a duty to disclose a material fact

14   (specifically, the existence of a safety recall for a car part) where the dealership "made partial

15   representations about [a] vehicle[] . . . and those representations were likely to mislead."

16   *Gutierrez*, 19 Cal. App. 5th at 1262-63; *see also Hodson*, 891 F.3d at 863-64 n.3 (discussing

17   *Gutierrez*).

18   At the motion hearing, the parties agreed that the *Wilson* and *Hodson* tests, on the one

19   hand, and the *LiMandri* test, on the other, represent *alternative* means of pleading a pure-omission

20   claim. *See* Hearing Tr. at 25-26 (detailing Toyota's view that plaintiffs can establish a duty to

21   disclose if the product defect presents "a safety issue," if the defect "go[es] to the central function

22   of the product," *or* if plaintiffs "satisf[y] one of the *LiMandri* factors"). The Court concludes that

23   the parties are correct, for a number of reasons.

24   First, this approach accords with *Hodson*, which left the relationship between *LiMandri*

25   materiality and safety hazard/central functionality defects unsettled but did not affirmatively

26   require plaintiffs to plead both to state an omission-based consumer protection claim. *See* 891

27   F.3d at 863-64 (noting, *e.g.*, that *Rutledge* "did not apply the *LiMandri* factors" in ruling that

28   defendants had a duty to disclose a defect to central functionality). Second, the California

37

United States District Court
Northern District of California

1   Supreme Court has held that a misrepresentation is "material" where "a reasonable man would

2   attach importance to its existence or nonexistence in determining his choice of action in the

3   transaction in question." *Engalla v. Permanente Med. Grp., Inc.*, 15 Cal.4th 951, 977 (1997)

4   (internal quotation omitted); *see also Collins*, 202 Cal. App. 4th at 256 ("In the CLRA context, a

5   fact is deemed 'material' . . . if a 'reasonable [consumer]' would deem it important in determining

6   how to act in the transaction at issue."). This standard is more forgiving to plaintiffs than the

7   Ninth Circuit's safety hazard or central functionality tests (as will be explained below), which

8   suggests that the latter two should not be read as proxies for the first. And because "material

9   facts" are at issue in *LiMandri*, 52 Cal. App. 4th at 336, the California Supreme Court's definition

10  of "material," rather than the Ninth Circuit's formulations of safety hazards or central

11  functionality, is more germane to the *LiMandri* factors. Finally, the more lenient materiality

12  standard of the *LiMandri* test is rational insofar as that test also imposes additional pleading

13  requirements on plaintiffs to establish a defendant's duty to disclose. In mandating that a

14  defendant have "exclusive knowledge of material facts not known to [a] plaintiff," for example,

15  the second *LiMandri* factor deems the materiality of a misrepresentation insufficient, on its own,

16  to create liability for a defendant. *See id.* This outcome makes sense from a policy perspective

17  insofar as a "material" misrepresentation does not necessarily rise to the level of a safety hazard or

18  a central functionality defect, as defined in *Wilson* and *Hodson*. By the same logic, safety hazards

19  and central functionality defects arguably need not be accompanied by the defendant's knowing

20  decision to sell a faulty product (per *LiMandri*'s second prong) if those defects are considered

21  sufficiently harmful to consumer wellbeing to create liability by themselves. As indicated below,

22  the instant case in fact presents a telling example of a product defect that is material (*i.e.*,

23  important to consumer choice) but that does not amount to a safety hazard or affect the product's

24  central functionality.

25      The Court therefore analyzes the sufficiency of the California Plaintiffs' omission-based

26  claims under all three theories of liability.

27      As to the *Wilson* test, Toyota is correct that the complaint nowhere alleges that the fuel

28  tank defect poses an "unreasonable safety hazard" to consumers. *See* 668 F.3d at 1143; *see also*

38

1   Mot. at 6 (observing that "none of the Plaintiffs allege . . . that they have been unable to drive their

2   [Vehicles]," "that they have run out of gas," or that they have suffered "any physical injury" as a

3   result of the defect).  Plaintiffs therefore fail to state an omission claim on the basis of a safety

4   hazard.

5          Regarding the *Hodson* test, Toyota argues that an "alleged defect must go to the heart of

6   the product's functionality and effectively render it incapable of use" to satisfy the central

7   functionality requirement.  Opp'n at 23.  Indeed, the California authorities cited in *Hodson* appear

8   to set a high bar.  In *Collins*, "plaintiffs complained that a floppy disk controller defect . . . caused

9   critical data corruption of [computers'] hard drive[s]."  *Hodson*, 891 F.3d at 862 (citing *Collins*,

10  202 Cal. App. 4th at 253).  Similarly, plaintiffs in *Rutledge* alleged that "laptops contained

11  defective inverters that would cause the screens to dim and darken during the warranty period."

12  *Id.* at 862-63 (citing *Rutledge*, 238 Cal. App. 4th at 1171).  These allegations went to the products'

13  central functionality because "[a] computer chip that corrupts the hard drive, or a laptop screen

14  that goes dark, renders those products *incapable of use by any consumer*."  *Id.* at 864 (emphasis

15  added).  As Toyota observes, "allegations that the fuel tank does not fill to its advertised capacity,

16  but still can achieve 330-480 miles on a single tank of [gas], do not plead a defect" rendering the

17  Vehicles incapable of use in any meaningful sense.  Opp'n at 23.  Plaintiffs thus fail to state an

18  omission claim under the central functionality test of *Hodson*, *Collins*, and *Rutledge*.[16]

19         That leaves the California Plaintiffs reliant on *LiMandri*.  Plaintiffs argue that they state

20  omission-based claims under the second, third, and fourth *LiMandri* prongs.  Opp'n at 19.  As to

21  the third *LiMandri* scenario, which applies "when the defendant actively conceals a material fact

22  from the plaintiff," 52 Cal. App. 4th at 336, the complaint does not contain any factual allegations

23  raising a reasonable inference that Toyota actively concealed the fuel tank defect from consumers.

24  *See* Part IV.D.2, *supra*.

25  _____

26  [16] The case cited by Plaintiffs at the motion hearing in support of their central functionality
    argument, *Stockinger v. Toyota Motor Sales U.S.A., Inc.*, 2017 WL 10574372 (C.D. Cal. July 7,

27  2017), is inapposite.  The court there did not address central functionality; rather, it held that
    plaintiffs pled an unreasonable safety hazard where they alleged that they were "exposed to mold

28  blown into the passenger compartments of their vehicles by [a] defective HVAC system."  *Id.* at
    *20.

As previously explained, however, the Court finds that the complaint plausibly alleges Toyota's "exclusive knowledge" of the defect at the time the Vehicles were sold, as the second *LiMandri* prong requires.  *See* 52 Cal. App. 4th at 336.  The only remaining question under *LiMandri* is whether the defect was "material."  "In order for non-disclosed information to be material, a plaintiff must show that 'had the omitted information been disclosed, one would have been aware of it and behaved differently.'"  *Falk*, 496 F. Supp. 2d at 1095 (quoting *Mirkin v. Wasserman,* 5 Cal.4th 1082, 1093 (1993)).  As the Court indicated at the motion hearing, Plaintiffs' assertion that the Vehicles' purported fuel tank capacity was material information is plausible, as it is reasonable for a consumer to consider a vehicle's mileage range in deciding whether to purchase it and how much to pay.  *See* Hearing Tr. at 14.  The California Plaintiffs have therefore stated an omission claim under the second prong of *LiMandri*.

As to the fourth *LiMandri* prong, it is reasonable to infer, based on Plaintiffs' allegations, that Toyota made "partial representations but also suppress[ed] some material facts" in stating that the Vehicles had a fuel tank capacity of 14.5 gallons.  *See* 52 Cal. App. 4th at 336.  Plaintiffs clarified at the motion hearing that their partial misrepresentation theory is based on the allegation that "Toyota is representing what the size of the fuel tank is and what the estimated mileage range is without providing . . . the important . . . caveat information" that the tanks only achieve 8-11 gallons of fuel storage.  *See* Hearing Tr. at 23.  In reaching this conclusion, the Court presumes that "suppresses" in the fourth *LiMandri* prong requires a lesser showing of wrongdoing than "actively conceals" in the third prong—hence the distinction between the third and fourth *LiMandri* prongs.  Given that the Court credits Plaintiffs' allegation that Toyota had presale knowledge of the fuel tank defect, it is plausible that the company's subsequent partial misrepresentations about fuel tank capacity entailed the "suppression" of material information that the tank could not fill to capacity.  Plaintiffs' omission claim under the fourth *LiMandri* prong is therefore adequately pled.

Toyota's motion to dismiss California Plaintiffs' omission-based consumer protection claims on the ground that Plaintiffs fail to establish a duty to disclose is thus **DENIED** on the grounds stated herein.

40

1          2.          Colorado, Iowa, Oregon, and Virginia (Intent)

2          Toyota argues that Plaintiffs' claims under the Colorado Consumer Protection Act (Count

3   10), Iowa Consumer Frauds Act (Count 25), Oregon Unfair Trade Practices Act (Count 75), and

4   Virginia Consumer Protection Act (Count 84) should be dismissed because Plaintiffs "failed to

5   plausibly plead that violations of the respective acts were committed willfully or intentionally."

6   Opp'n at 26-27.  The Court disagrees.  As it previously explained, Plaintiffs have adequately

7   alleged that Toyota had presale knowledge of the fuel tank defect and failed to disclose it.  This

8   allegation suffices, at the pleading stage, to establish Toyota's knowledge of its wrongdoing and

9   its intent to deceive consumers.

10          Further, while a willfulness element in these states' consumer protection statutes could

11   conceivably demand allegations of more culpable misconduct than those offered in the complaint,

12   the authorities cited by Toyota do not require a showing of willfulness (in the sense of a specific

13   intent to violate the law) to state a claim under any of the aforementioned statutes.  The Colorado

14   Act requires "that the defendant engaged in an unfair or deceptive trade practice," namely a false

15   representation "made either with knowledge of [the statement's] untruth, or recklessly and

16   willfully made without regard to its consequences, and with an intent to mislead and deceive the

17   plaintiff."  *Rhino Linings USA, Inc. v. Rocky Mountain Rhino Lining, Inc.*, 62 P.3d 142, 137 (Colo.

18   2003) (internal quotations omitted).  This statement suggests that the statute may be satisfied on a

19   showing of either knowledge or recklessness as to the representation's falsity.  As the Court

20   indicated above, Plaintiffs have adequately pled Toyota's knowledge of the fuel tank defect.

21          Regarding the Iowa Act, Toyota quotes statutory language providing that

22   misrepresentations and other unfair practices are actionable when done with "the intent that others

23   rely on upon the unfair practice."  Mot. at 27 (quoting Iowa Code § 714H.3(1)).  As this Court has

24   previously observed—and as the plain terms of the statute indicate—"the only intent required by

25   the statute is that the defendant act 'with the intent *that others rely*' upon his omissions."  *In re*

26   *Chrysler-Dodge-Jeep Ecodiesel Mktg., Sales Practices, and Prods. Liab. Litig.*, 295 F. Supp. 3d

27   927, 1019 (N.D. Cal. 2018) (quoting *State ex rel. Miller v. Pace*, 677 N.W.2d 761, 771 (Iowa

28   2004)) (emphasis in original).  As Plaintiffs' allegations here raise a reasonable inference that

United States District Court
Northern District of California

1   Toyota intended consumers to rely on the company's misrepresentations concerning the Vehicles'

2   fuel tank capacity, the Iowa Plaintiffs' claims are not barred by the Act's intent requirement.

3           Toyota also argues that the Oregon Act "requires 'willfulness' for a viable claim" and that

4   "the plain language of the statue requires either a knowing or willful violation."  Reply at 17

5   (quoting Or. Rev. Stat. § 646.605(10)).  It is true that "[t]o state a claim under the [Act] Plaintiff

6   must allege . . . willfulness by Defendant."  *Bank of N.Y. Mellon v. Stabenow*, 2017 WL 1538156,

7   at *5 (D. Or. Apr. 25, 2017).  But a "willful" violation of the Act is one that "occurs when the

8   person committing the violation knew *or should have known* that the conduct of the person was a

9   violation."  Or. Rev. Stat. § 646.605(10) (emphasis added).  As a result, a plaintiff need only

10  allege facts "from which the Court could infer Defendant knew or should have known [its

11  conduct] was a violation of the UTPA."  *Bank of N.Y. Mellon*, 2017 WL 1538156, at *5 (internal

12  quotation omitted) (brackets in original).  "In other words, the term 'willful,'" for purposes of the

13  Act, "requires no more than proof of ordinary negligence by a defendant in not knowing, when it

14  should have known, that a representation made by him was not true."  *State ex rel. Redden v.*

15  *Discount Fabrics, Inc.*, 615 P.2d 1034, 1039 (Or. 1980).  Plaintiffs' allegations easily satisfy the

16  Oregon Act's negligence requirement.

17          As to the Virginia Act, Toyota appears to be correct that, where plaintiffs bring a claim

18  under the Act sounding in fraud, they must allege "a false representation, of material fact, made

19  intentionally and knowingly, with intent to mislead, reliance by the party misled, and resulting

20  damage."  *Galloway v. Priority Imports Richmond, LLC*, 426 F. Supp. 3d 236, 244 (E.D. Va.

21  2019) (internal quotation omitted); *see also Lambert v. Downtown Garage, Inc.*, 262 Va. 707

22  (2001) (stating that a plaintiff's fraud-based action required him to plead the aforementioned

23  elements in "his claim for common law fraud . . . and the claim for a violation of the Consumer

24  Protection Act").  Plaintiffs cite *Owens v. DRS Automotive Fantomworks, Inc.*, 288 Va. 489

25  (2014), for the proposition that a consumer need not necessarily plead an intentional violation of

26  the Act to state a viable claim.  The Supreme Court of Virginia in that case agreed with plaintiffs

27  that the Act's scope extends beyond common-law fraud, and that the Act "does not require the

28  consumer to prove in every case that misrepresentations were made knowingly or with the intent

1    to deceive" but only in cases where plaintiffs seek treble damages for "willful" violations of the

2    Act.  *Id.* at 497.  But the Court declined to identify the mental state that *would* be required to state

3    a non-willfulness claim under the Act or, indeed, whether such a claim could ever succeed where

4    it sounds in fraud.  In any event, even under *Galloway*, Plaintiffs have plausibly pled knowledge

5    and intent on Toyota's part such that their claims are not precluded on the basis of the Virginia

6    Act's intent requirement.

7            Toyota's motion to dismiss the Colorado, Iowa, Oregon, and Virginia consumer protection

8    claims on the basis of inadequately pled knowledge or intent is therefore **DENIED**.

9            3.       Connecticut and North Dakota (Damages)

10           Toyota contends that Plaintiffs fail to state a claim under the Connecticut Unfair Trade

11   Practices Act (Count 13) or the North Dakota Consumer Fraud Act (Count 65) "because they fail

12   to sufficiently allege damages."  Opp'n at 27.  With respect to the Connecticut Act, Toyota cites to

13   *Web Press Services Corp. v. New London Motors, Inc.*, 533 A.2d 1211 (Conn. 1987), to support

14   its argument that the Act requires an alleged injury to be "substantial."  In that case, the Supreme

15   Court of Connecticut held that a plaintiff had not suffered a "substantial injury" within the

16   meaning of the Act where an automobile defect was valued at "3.7% of the cost of the vehicle."

17   *Id.* at 1214.  But as Plaintiffs point out, the Supreme Court has adopted a multi-factor balancing

18   test "for determining whether a trade practice is 'unfair or deceptive'" under the Act.  Opp'n at 23.

19   The factors include: "(1) Whether the practice . . . offends public policy as it has been established

20   by statutes, the common law, or otherwise . . . ; (2) whether it is immoral, unethical, oppressive, or

21   unscrupulous; and (3) whether it causes substantial injury to consumers, competitors, or other

22   businessmen."  *Harris v. Bradley Mem'l Hosp. and Health Ctr., Inc.*, 994 A.2d 153, 173 (Conn.

23   2010).  "All three criteria do not need to be established to support a finding of unfairness."  *Id.*  As

24   Toyota's motion to dismiss is premised only on the third of these factors and fails to address the

25   first two, it has not demonstrated that the Connecticut Plaintiff's consumer protection claim is

26   implausible as a matter of law.  And whether the consumer's injury is sufficiently substantial or

27   material is generally a question of fact for the jury.

28           Regarding the North Dakota Act, Toyota relies on *Ziegelmann v. DaimlerChrysler Corp.*,

United States District Court
Northern District of California

1    649 N.W.2d 556 (N.D. 2002), for the proposition that plaintiffs' allegations of damages are

2    impermissibly speculative where they are "based on alleged diminution in value" and do not

3    involve, for example, "a sale of the vehicle at a diminished value or any incurred costs to repair

4    the vehicle."  Mot. at 28; *see also Ziegelmann*, 649 N.W.2d at 559 ("In this jurisdiction, the torts

5    of negligence, fraud and deceit require proof of actual damages as an essential element of a

6    plaintiff's case. . . .").  But this argument is effectively a rehash of Toyota's unpersuasive

7    contention that Plaintiffs have not suffered an injury-in-fact.  *See* Part IV.A.  As with the standing

8    issue, Toyota's cited authority is distinguishable from the facts of the instant case.  In *Ziegelmann*,

9    the plaintiff claimed that the vehicle he purchased lacked a braking mechanism it should have had,

10   but the vehicle's manufacturer never represented that the vehicle was equipped with the

11   mechanism and the safety hazard the plaintiff was concerned about never materialized.  649

12   N.W.2d at 564, 561.  Here, in contrast, Plaintiffs allege that Toyota falsely advertised the

13   Vehicles' fuel tank capacity and that the defect actually and currently exists.  As a result,

14   Plaintiffs' allegations that they have suffered damages is plausible for purposes of the motion to

15   dismiss.

16        Toyota's motion to dismiss the Connecticut and North Dakota consumer protection claims

17   on the basis of inadequately pled damages is therefore **DENIED**.

18        4.    Florida (Demand Letter)

19        Toyota next argues that Florida's Deceptive and Unfair Trade Practices Act (Count 16)

20   "requires consumers to serve a demand letter at least 30 days before suing a motor vehicle dealer

21   or its 'employees, agents, principals, sureties, and insurers.'"  Mot. at 28 (quoting Fla. Stat. §

22   501.98(1)).  Because Plaintiff Tran does not allege that he served a demand letter on Toyota, the

23   company asserts, he failed to comply with this statutory requirement.  But, as Plaintiffs point out,

24   this requirement expressly "applies only to a motor vehicle *dealer*" or its "employees, agents,

25   principals, sureties, and insurers."  Opp'n at 24 (quoting Fla. Stat. § 501.98(1)) (emphasis in

26   original).  According to Plaintiffs, "[n]o court has ever applied this demand requirement to a

27   vehicle *manufacturer*," and Toyota does not cite any countervailing authority.  *See id.* (emphasis

28   in original).  Moreover, the Florida Act's demand-letter requirement "does not apply to any action

44

1    brought as a class action"—or at least to one "that is ultimately certified as a class action."  Fla.

2    Stat. § 501.98(7).  Plaintiffs thus argue that Plaintiff Tran need not serve a demand letter on

3    Toyota at this juncture.  Opp'n at 24.  Tellingly, Toyota fails to respond to these arguments in its

4    reply brief, suggesting that it has abandoned the motion as to this aspect of the Florida Act.

5           Toyota's motion to dismiss the Florida consumer protection claim on the basis of the

6    demand-letter requirement is therefore **DENIED**.

7           5.    <u>Idaho and Kentucky (Privity)</u>

8           Toyota asserts that Plaintiffs' claims under the Idaho Consumer Protection Act (Count 19)

9    and the Kentucky Consumer Protection Act (Count 28) must be dismissed because both statutes

10   "require the plaintiff to be in a contractual relationship with the allegedly deceptive party," and

11   Plaintiffs here lack privity with Toyota.  *See* Mot. at 28.  This Court addressed the same issue in

12   *Chrysler-Dodge-Jeep*, where the defendants argued "that privity of contract is required to state a

13   claim under the Idaho and Kentucky consumer protection statutes."  295 F. Supp. 3d at 1021.

14   With respect to Idaho, the Court there acknowledged caselaw stating that "[i]n order to have

15   standing under the ICPA, the aggrieved party must have been in a contractual relationship with the

16   party alleged to have acted unfairly or deceptively."  *Id.* (quoting *Taylor v. McNichols*, 243 P.3d

17   642, 662 (Idaho 2010)).[17]  But that caselaw does not make clear that "a direct contract between the

18   plaintiff and defendant (immediate privity)" is required to state a claim under the Idaho Act.  *Id.*

19   Instead, the authorities cited by the Idaho Supreme Court in *Taylor* "simply reflect that a

20   plaintiff's claim must ultimately be founded on *a* contract."  *Id.* at 1022 (emphasis added).  The

21   Court thus permitted plaintiffs' claims in *Chrysler-Dodge-Jeep* to proceed since they "appear[ed]

22   to have contracts with, *e.g.*, dealers that resulted in the Class Vehicles being purchased."  *Id.*

23   Toyota suggests that *Chrysler-Dodge-Jeep* is distinguishable because Plaintiffs here fail to

24   specifically allege, as plaintiffs in the earlier case did, "that the dealers with whom they entered

25   into direct contractual relationships . . . acted as agents of the manufacturer."  Reply at 19.  But

26   this Court's analysis in *Chrysler-Dodge-Jeep* turned on the fact that plaintiffs adequately alleged

27

28   [17] Toyota here relies on the same passage from *Taylor*, as quoted in *Duspiva v. Fillmore*, 293 P.3d
     651, 660 (Idaho 2013).  *See* Mot. at 28.

United States District Court
Northern District of California

1    that they were in privity with the dealers, not that the dealers were agents of the manufacturers.

2    *See* 295 F. Supp. 3d at 1022.  The Idaho Plaintiff here likewise alleges that he purchased his

3    Vehicle from a dealership, with whom he was presumably in a direct contractual relationship.  *See*

4    Compl. ¶ 14 (stating that "Plaintiff Jedediah Clawson . . . purchased a 2019 Toyota RAV4

5    Hybrid . . . from Peterson Toyota located [in] Boise, Idaho").  The Court therefore rejects Toyota's

6    argument that the Idaho Act requires immediate privity between plaintiff and defendant.

7        As to the Kentucky Act, this Court in *Chrysler-Jeep-Dodge* concluded that it "require[s]

8    that plaintiffs have a direct contractual relationship with the defendant."  295 F. Supp. 3d at 1022

9    (citing, *e.g.*, *Keaton v. G.C. Williams Funeral Home, Inc.*, 436 S.W.3d 538, 546 (Ky. Ct. App.

10   2013)).  Plaintiffs also concede that the Kentucky Act "contains a privity requirement."  Opp'n at

11   25; *see also Skilcraft Sheetmetal, Inc. v. Ky. Mach., Inc.*, 836 S.W.2d 907, 909 (Ky. Ct. App.

12   1992) (stating that the Act "plainly contemplates an action by a purchaser against his immediate

13   seller").  Plaintiffs argue, however, that "courts applying the statute recognize an exception where

14   [a] plaintiff also alleges breach of an express warranty."  *Id.* (citing *Bosch v. Bayer Healthcare

15   Pharm., Inc.*, 13 F. Supp. 3d 730, 750 (W.D. Ky. 2014), which states that "there is an exception to

16   the privity requirement when express representations are alleged").  In *Skilcraft Sheetmetal*, a case

17   relied on by Toyota, *see* Mot. at 28, the Kentucky appellate court concluded that "a subsequent

18   purchaser may not maintain an action against a seller with whom he did not deal *or who made no

19   warranty for the benefit of the subsequent purchaser*."  836 S.W.2d at 909 (emphasis added).  In

20   holding "that privity of contract" must generally "exist between the parties in a suit alleging a

21   violation of the Consumer Protection Act," the court specifically distinguished between the typical

22   case and one in which a defendant "provides warranties to the ultimate purchaser to repair the item

23   purchased."  *Id.* (citing *Ford Motor Co. v. Mayes*, 575 S.W.2d 480, 485-86 (Ky. Ct. App. 1978)).

24       Federal courts have applied the warranty-based exception to privity discussed in *Skilcraft

25   Sheetmetal*.  In *Naiser v. Unilever U.S., Inc.*, 975 F. Supp. 2d 727 (W.D. Ky. 2013), plaintiffs

26   argued that the exception was relevant to their consumer protection claim against the manufacturer

27   of a defective haircare product where they purchased the product at various Kentucky retail stores.

28   *See id.* at 731, 743.  The *Naiser* court agreed, finding that "Plaintiffs ha[d] sufficiently alleged that

46

[the defendant] made valid express warranties for Plaintiffs' benefit." *Id.* at 743.  In that case, the court also found that plaintiffs had stated a claim for breach of express warranty against the defendant at the pleading stage. *Id.* at 740.  The court did not clarify, however, whether its ruling on the consumer protection claim was dependent on the *viability* of plaintiffs' express warranty claim.  *See id.* at 743.  Additionally, in *Bosch* the same court followed *Naiser* in applying the *Skilcraft Sheetmetal* exception to an analogous set of facts.  The court there characterized *Naiser* as standing for the principle that plaintiffs can maintain a claim under the Act where they "allege[] that the manufacturer made valid express warranties for Plaintiffs' benefit." 13 F. Supp. 3d at 751.  The court thus refused to dismiss plaintiffs' consumer protection claim where, *inter alia*, they also stated an express warranty claim against the defendant. *Id.* at 749.  As in *Naiser*, the court declined to condition its upholding of the consumer protection claim on the viability of plaintiffs' related express warranty claim. *Id.* at 751.

As noted above, Plaintiffs here contend that the *Skilcraft Sheetmetal* exception applies whenever plaintiffs bringing a claim under the Kentucky Act also *allege* (rather than prove) breach of an express warranty by the defendant.  *See* Opp'n at 25.  Toyota responds that the exception is inapplicable where, as here, "the warranty does not cover the alleged . . . defect."  Reply at 19. The issue is a close one.  On the one hand, there is logic to predicating an exception to the privity requirement on a claim that is actually *covered* by an express warranty.  In a sense, the warranty provides privity between the parties.  On the other hand, it can be argued that the express warranty establishes a contractual relationship between the parties, and that this fact alone should allow for a consumer protection claim even if that claim is not based precisely on the warranty.  In any event, courts addressing this question have stated that the privity requirement does not apply where the defendant "made [a] warranty for the benefit of the subsequent purchaser" or, in other words, where the defendant "provide[d] warranties to the ultimate purchaser to repair the item purchased."  *Skilcraft Sheetmetal*, 836 S.W.2d at 909.  These formulations require only that the warranty be made for the consumer's benefit or, at most, that it covers "the item purchased"; they do not require that the warranty cover the *specific defect* alleged as part of a plaintiff's consumer protection claim.  Moreover, in *Mayes*—the decision that formed the basis for the *Skilcraft*

*Sheetmetal* exception—the Kentucky appellate court affirmed a jury verdict for plaintiffs who sued Ford under the Consumer Protection Act for "conduct relating to" the company's express limited warranty. *See* 575 S.W.2d at 481-82. Absent clear caselaw to the contrary, the Court at this juncture will not dismiss the Kentucky Plaintiffs' consumer protection claim on the basis of a lack of privity.

Toyota's motion to dismiss Plaintiffs' Idaho and Kentucky consumer protection claims due to lack of privity is therefore **DENIED**, but may be subject to reconsideration as this case advances.

### 6.    Michigan, Nebraska, and Oklahoma (Exempt Conduct)

Toyota asserts that Plaintiffs' claims pursuant to the Michigan Consumer Protection Act (Count 33), Nebraska Consumer Protection Act (Count 46), and Oklahoma Consumer Protection Act (Count 72) are barred "because the alleged conduct at issue is exempt." Opp'n at 29. Specifically, Toyota contends that "[a]dvertising of motor vehicles (including as to fuel mileage) is regulated by federal and state regulatory bodies, and cannot form the basis for liability" under the aforementioned statutes. *Id.*

Regarding the Michigan Act, Plaintiffs acknowledge that the statute "exempts any 'transaction or conduct specifically authorized under laws administered by a regulatory board or officer acting under statutory authority of this state or the United States.'" Opp'n at 26 (quoting Mich. Comp. Laws § 445.904(1)(a)). "The Michigan Supreme Court construes this exemption broadly, finding that 'the relevant inquiry is whether the general transaction is specifically authorized by law, regardless of whether the specific misconduct alleged is prohibited.'" *Matanky v. Gen. Motors LLC*, 370 F. Supp. 3d 772, 799 (E.D. Mich. 2019) (quoting *Liss v. Lewiston-Richards, Inc.*, 732 N.W.2d 514, 518 (Mich. 2007)). *Matanky* involved allegations that GM falsely advertised a certain vehicle as being suitable "for use on both public roadways and specialized closed race tracks" even though the vehicle contained a design defect that rendered it unfit for track use. 370 F. Supp. 3d at 781-82. The *Matanky* court concluded that the general transaction in that case—whether construed as "the sale of a new car by a licensed dealer" or automobile advertising by "car wholesalers like Toyota"—is "specifically authorized and

United States District Court
Northern District of California

regulated by law" and thus "exempt from the MCPA." *Id.* at 800; *see also Rosenbaum v. Toyota Motor Sales, U.S.A., Inc.*, 2016 WL 9775018, at *3 (E.D. Mich. Oct. 21, 2016) (finding that "Michigan regulates how car wholesalers like Toyota advertise automobiles . . . and it regulates the content of general automobile advertisements"); *but see Hoff v. Mercedes-Benz USA, LLC*, 2005 WL 3723201, at *8 (Mich. Cir. Ct. Dec. 30, 2005) (finding "that although automobile dealers must be licensed, the specific act of selling an automobile or manufacturing an automobile is not regulated and therefore that act is not excluded from the CPA").

In light of the caselaw cited by the parties, it appears that Toyota could claim that its marketing of the Vehicles (specifically with respect to fuel tank capacity) is conduct generally authorized and regulated by state law beyond the Michigan Consumer Protect Act, and is therefore exempt under the Act. However, Toyota fails to identify any specific law or statutory authority applicable here. As the Act places "[t]he burden of proving an exemption . . . upon the person claiming the exemption," Mich. Comp. Laws § 445.904(4), the Court concludes that Toyota has failed to demonstrate that its conduct is exempt from the Act, at least at this juncture.

Toyota is on more solid ground, however, with respect to the Nebraska and Oklahoma Acts. These statutes once again exempt conduct elsewhere governed by federal or state law. *See* Neb. Rev. Stat. § 59-1617(1) ("[T]he Consumer Protection Act shall not apply to actions or transactions otherwise permitted, prohibited, or regulated . . . under statutory authority of this state or the United States."), Okla. Stat. tit. 15, § 754 ("Nothing in the Oklahoma Consumer Protection Act shall apply to . . . [a]ctions or transactions regulated under laws administered by the Corporation Commission or any other regulatory body or officer acting under statutory authority of this state of the United States."). Toyota argues that the Nebraska Motor Vehicle Industry Regulation Act and Oklahoma Motor Vehicle Commission are "the proper governing regulations and agency," respectively, "to regulate the advertising of motor vehicles" in these states. Reply at 20.

Toyota's reasoning is persuasive. Chapter 60 of the Nebraska Revised Statutes governs motor vehicles and makes it unlawful "[t]o advertise or to make any statement, declaration, or representation in any advertisement that cannot be substantiated in fact." Neb. Rev. Stat. § 60-

49

United States District Court
Northern District of California

1411.03(23).  The plain terms of the statute strongly suggest that the false advertising of automobiles is covered by this provision and that such conduct is therefore exempt under the Nebraska Consumer Protection Act.  Similarly, Chapter 15 of the Oklahoma Motor Vehicle Commission's administrative code governs advertising and provides that "[a] licensee"—*i.e.*, "any entity or person required to obtain a license from the Oklahoma Motor Vehicle Commission"— "shall not use false or misleading advertising."  Okla. Admin. Code §§ 465:15-3-1 and 465:15-1-2.  Again, the regulatory language indicates that misrepresentations in the advertising of motor vehicles are governed by this provision and are thus exempt from the Oklahoma Consumer Protection Act.  While Plaintiffs observe that Toyota "fails to identify *any* case law exempting vehicle manufacturers from liability" under the states' consumer protection statutes, Opp'n at 26 (emphasis in original), Plaintiffs' cited authorities do not contradict the plain meaning of aforementioned provisions.  For example, the court in *In re General Motors Corp. "Piston Slap" Products Liability Litigation*, 2005 WL 1924335 (W.D. Okla. Aug. 8, 2005), found only that the Oklahoma Motor Vehicle Commission's authority did not extend to the conduct at issue in that case, namely "the regulation of allegedly defective products"; such conduct was therefore not exempt from the Oklahoma Act.  *Id.* at *3.  But, as Toyota points out, Plaintiffs' consumer protection claims here do not focus on "whether the [Vehicles] contained a design defect, but how TMS allegedly advertised and represented [their] fuel tank capacity."  Reply at 20.

As a result, Toyota's motion to dismiss the Michigan Plaintiff's consumer protection claim on the ground that Toyota's conduct is exempt from the Michigan Consumer Protection Act is **DENIED**.  Toyota's motion to dismiss the Nebraska and Oklahoma Plaintiffs' consumer protection claims on the same ground, however, is **GRANTED**.

> 7.   Arizona, Illinois, Minnesota, Missouri, New Jersey, Nevada, Texas, and Wisconsin (Loss Causation)

Toyota contends that Plaintiffs' claims under the Arizona Consumer Fraud Act (Count 1), Illinois Consumer Fraud and Deceptive Business Practices Act (Count 22), Minnesota Consumer Fraud Act (Count 36), Missouri Merchandising Practices Act (Count 40), Nevada Deceptive Trade Practices Act (Count 49), New Jersey Consumer Fraud Act (Count 55), Texas Deceptive Trade

50

Practices Act (Count 81), and the Wisconsin Deceptive Trade Practices Act (Count 87) should be dismissed because Plaintiffs fail to adequately allege "that their alleged losses were caused by a violation of these acts." Mot. at 30. In particular, Toyota argues that Plaintiffs' losses are predicated on the "diminished value" of their Vehicles, and that such diminution of value results solely from the defectively designed fuel tank—not from any "deceptive, unfair, or fraudulent conduct" on Toyota's part, which is what the consumer protection statutes proscribe. *See id.* "As such, Plaintiffs have failed to plead a sufficient causal connection between their alleged losses and the alleged violative conduct." *Id.* at 31. Plaintiffs respond that "[t]his argument defies both common sense and the plain text of the Complaint," which alleges that Plaintiffs "purchased or leased defective vehicles that they otherwise would not have and overpaid for those vehicles" as a "direct and proximate result of TMS's unfair and deceptive advertising." Opp'n at 27. Plaintiffs conclude that "[t]his is a sufficient causal connection to state a claim for relief." *Id.*

The Court agrees with Toyota insofar as the complaint fails to allege, with adequate specificity, that Plaintiffs were aware of, and relied on, Toyota's alleged misrepresentations about fuel tank capacity in the company's marketing materials. *See* Part IV.D.1. Thus, to the extent that these states identify loss causation with reliance, Plaintiffs' claims are dismissed. If Plaintiffs are able to plead conduct violative of the applicable statute(s), they have established causation between Toyota's allegedly deceptive conduct and Plaintiffs' injuries of paying more than what the vehicles are actually worth. The caselaw cited by the parties does not contravene the Court's conclusion. *See, e.g.*, *Grp. Health Plan, Inc. v. Philip Morris, Inc.*, 621 N.W.2d 2, 14 (Minn. 2001) (stating that, under the Minnesota Act, "there must be some 'legal nexus' between the injury and the defendants' wrongful conduct"); *Streber v. Hunter*, 221 F.3d 701, 729 (5th Cir. 2000) (stating that, under the Texas Act, a "producing cause is a substantial factor which brings about the injury and without which the injury would not have occurred").

Toyota's motion to dismiss the Arizona, Illinois, Minnesota, Missouri, Nevada, New Jersey, Texas, and Wisconsin Plaintiffs' consumer protection claims on the ground that Plaintiffs fail to plead loss causation is therefore **GRANTED** insofar as these statutes equate loss causation with reliance. As stated above, Plaintiffs are granted leave to amend their complaint.

8.      <u>New Hampshire (Territorial Limitation)</u>

Next, Toyota argues that "Plaintiff McPhie's claims under the New Hampshire Consumer Protection Act . . . (Count 52) exceed the territorial reach of the law."  Mot. at 31.  The Act makes it unlawful "for any person to use any unfair method of competition or any unfair or deceptive act or practice in the conduct of any trade or commerce *within this state*."  N.H. Rev. Stat. § 358-A:2 (emphasis added).  Toyota asserts that the Act's territorial limitation requires Plaintiff McPhie to "show that the deceptive transaction or offending conduct occurred in the state," and that his failure to allege that Toyota's misrepresentations "*originate[d]* in New Hampshire" therefore dooms his claim.  Mot. at 31 (emphasis in original).  Plaintiffs counter that the territorial limitation is satisfied where a plaintiff alleges that he *received* misrepresentations in New Hampshire, and that Toyota's "attempt[] to add an additional requirement that the misrepresentation must *originate* in New Hampshire" is without foundation in the caselaw.  Opp'n at 28 (emphasis in original).

Plaintiffs are correct.  They need only allege that Toyota's misrepresentations were *received* in New Hampshire to state a claim under the state's Consumer Protection Act.  "[A] misrepresentation is made 'within-this-state' when New Hampshire is the locus of the offending conduct, or, put differently, *whenever a person receives a misrepresentation* in the State of New Hampshire."  *Ortiz v. Sig Sauer, Inc.*, 448 F. Supp. 3d 89, 107 (D.N.H. 2020) (internal quotation omitted) (emphasis added).  *See also Environamics Corp. v. Ferguson Enters., Inc.*, 2001 WL 1134727, at *4 (D.N.H. Sept. 24, 2001) (holding that New Hampshire was the locus of a misrepresentation where the plaintiff received deceptive documentation inside the state).  In *Ortiz*, the court thus dismissed the plaintiff's consumer protection claim where the alleged misrepresentations "originat[ed] from a place of business in New Hampshire" but were received in another state.  448 F. Supp. 3d at 107-08.  Because the plaintiff failed to show "that he received any alleged misrepresentations in New Hampshire or was injured by undisclosed information in the state," he failed to plead a violation of the Act.  *Id.* at 108.  Toyota's reliance on *Precourt v. Fairbank Reconstruction Corp.*, 856 F. Supp. 2d 327 (D.N.H.), moreover, is misplaced.  The court there dismissed a plaintiff's consumer protection claim where she failed to allege that the

1    defendant "shipped anything to New Hampshire *or made any representations to anyone in New*

2    *Hampshire*." *Id.* at 344 (emphasis added).

3    Nevertheless, Plaintiffs are incorrect in arguing that Mr. McPhie "alleges that he and

4    members of the New Hampshire class received misrepresentations regarding the RAV4s in New

5    Hampshire." Opp'n at 28. As explained above, the complaint states only that "Plaintiff McPhie

6    believed and relied upon Toyota's representations that the RAV4's fuel tank capacity was 14.5

7    gallons." Compl. ¶ 24. Mr. McPhie does not specifically allege "that he received any alleged

8    misrepresentations in New Hampshire or was injured by undisclosed information in the state."

9    *See Ortiz*, 448 F. Supp. 3d at 108. Toyota's motion to dismiss Plaintiff McPhie's consumer

10    protection claim on the ground that the deceptive conduct did not occur within the state is

11    therefore **GRANTED**. Plaintiffs are granted leave to amend the complaint.

12            9.    Minnesota (Basis for Relief)

13    Toyota contends that Plaintiff Klinkhammer's claim under the Minnesota Uniform

14    Deceptive Trade Practices Act (Count 37) must be dismissed because he "seeks actual damages as

15    well as attorney's fees" even though "'the sole statutory remedy for deceptive trade practices is

16    injunctive relief.'" Mot. at 32 (quoting *Superior Edge, Inc. v. Monsanto Co.*, 964 F. Supp. 2d

17    1017, 1041 (D. Minn. 2013)). In response, Plaintiffs concede that, pursuant to the Act, "the

18    remedy for deceptive trade practices is injunctive relief." Opp'n at 29; *see also* Minn. Stat.

19    § 325D.45 (providing that injunctive relief, costs, and attorney fees are the remedies available

20    under the Act). Mr. Klinkhammer has therefore not pled a permissible claim for "actual damages"

21    under the Deceptive Trade Practices Act. *See* Compl. ¶ 525. And while Mr. Klinkhammer also

22    requests "any other just and proper relie[f] available under the Minnesota DTPA," *id.*, for the

23    reasons the Court provides below in Part IV.G he does not have Article III standing to pursue

24    injunctive relief.

25            Toyota's motion to dismiss Mr. Klinkhammer's claim under the Deceptive Trade Practices

26    Act is therefore **GRANTED**. Plaintiffs are again granted leave to amend the complaint.

27            10.    Montana (Class Action Prohibition)

28    Toyota asserts that Plaintiff Martin's claim under the Montana Unfair Trade Practices and

53

Consumer Protection Act (Count 43) should be dismissed because the Montana Act "expressly prohibits class actions and only permits individual claims." Mot. at 32 (citing Mont. Code Ann. § 30-14-133(1)). Plaintiffs respond that while the Act purports to preclude class actions, the bar "does not apply in federal court where Rule 23 controls." Opp'n at 29. As the parties recognize, the issue here is very similar to the one that the Supreme Court addressed in *Shady Grove Orthopedic Associates, P.A. v. Allstate Insurance Co.*, 559 U.S. 393 (2010), namely the relationship between state-law limitations on the class action device and federal courts' application of the *Erie* doctrine.

*Shady Grove* concerned a New York law that prohibited suits seeking to recover statutorily prescribed civil penalties from proceeding as class actions. *Id.* at 397. A four-Justice plurality applied the two-part *Erie* test articulated in *Hanna v. Plumer*, 380 U.S. 460 (1965), asking first whether the relevant federal rule "answers the question in dispute"; if it does, then "it governs . . . unless it exceeds statutory authorization or Congress's rulemaking power." 559 U.S. at 398 (citing, *e.g.*, *Hanna*, 380 U.S. at 463-64). The plurality concluded that the "question in dispute [was] whether Shady Grove's suit [could] proceed as a class action" and that "Rule 23 provide[d] an answer" in the affirmative. *Id.* In doing so, it held that applying Rule 23 to state-law claims does not run afoul of the Rules Enabling Act, which permits the Supreme Court to promulgate procedural rules for federal courts so long as they "do not abridge, enlarge or modify any substantive right." *Id.* at 406-07 (quoting 28 U.S.C. § 2072(b)). Rule 23, the plurality reasoned, "merely enables a federal court to adjudicate claims of multiple parties at once, instead of in separate suits," and thus "leaves the parties' legal rights and duties intact and the rules of decision unchanged." *Id.* at 408. A four-Justice dissent argued that, at step one of the *Erie* analysis, there was no direct conflict between Rule 23 and the New York law, *id.* at 446, and that the question was therefore "whether application of the [state] rule would have so important an effect upon the fortunes of one or both of the litigants that failure to [apply] it would be likely to cause a plaintiff to choose the federal court," *id.* at 452 (quoting *Hanna*, 380 U.S. at 468 n.9). Because the answer

was "yes," the dissenters concluded that the state law should apply.[18]  *See id.* at 456-57.

Justice Stevens, meanwhile, concurred with the plurality's formulation of the two-step framework as well as its ultimate holding that Rule 23 governed the case rather than state law.  *Id.* at 416, 429-30.  He deviated from the plurality's analysis at step two, however, stating that a federal rule "cannot govern a particular case in which the rule would displace a state law that is procedural in the ordinary sense of the term but is so intertwined with a state right or remedy that it functions to define the scope of the state-created right."  *Id.* at 423.  Justice Stevens nevertheless concluded that the state law did not "serve[] the function of defining New York's rights or remedies" since, *inter alia*, it applied "to claims based on federal law or the law of any other State" in addition to those based on New York law.  *Id.* at 432.

Lower courts have disagreed about how to apply *Shady Grove* in similar cases and frequently diverge over whether the Court's controlling opinion belongs to the plurality or Justice Stevens.  Toyota here relies principally on *In re Target Corp. Data Security Breach Litigation*, 66 F. Supp. 3d 1154 (D. Minn. 2014), which noted that "[m]ost courts that have evaluated state consumer-protection laws that conflict with Rule 23 have determined that Rule 23 cannot be applied to otherwise prohibited class actions, because the class-action prohibition defines the scope of the state-created right."  *Id.* at 1165; *see also* Reply at 21-22.  Plaintiffs, in contrast, rely on two cases from the District of Montana holding that Rule 23 supersedes the class-action limitation in that state's Consumer Protection Act.  In *Wittman v. CB1, Inc.*, 2016 WL 3093427 (D. Mont. June 1, 2016), the court chose to "look only to the part of [the plurality] opinion to which five Justices joined" and concluded that Rule 23 governed in federal court over the Montana Act because Rule 23 "affects only the process of enforcing the litigants' rights."  *Id.* at *6.  The same court revisited this issue in *Hill v. LLR, Inc.*, 2019 WL 3024896 (D. Mont. July 11, 2019), and, after providing a thorough analysis of *Shady Grove*, decided to follow its earlier holding in *Wittman*.  *Id.* at *5.  Thus, the District of Montana "appl[ies] Rule 23, instead of the MCPA, to determine whether a MCPA claim may be brought as a class action."  *Id.*

---

[18] *See* 559 U.S. at 457 ("[F]orum shopping will undoubtedly result if a plaintiff need only file in federal instead of state court to seek a massive monetary award explicitly barred by state law.").

1    The rulings of the District of Montana are consistent with decisions from this district

2    addressing similar issues.  *See, e.g.*, *Los Gatos Mercantile, Inc. v. E.I. DuPont De Nemours and*

3    *Co.*, 2015 WL 4755335, at *21 (N.D. Cal. Aug. 11, 2015) (applying Rule 23 to claims under

4    South Carolina's consumer protection law, which bars class actions in state court); *In re Optical*

5    *Disk Drive Antitrust Litig,*, 2012 WL 1366718, at *8 (N.D. Cal. Apr. 19, 2012) (same).

6    Plaintiff Martin may therefore pursue his MCPA claim as a representative of the Montana

7    Subclass under Federal Rule of Civil Procedure 23.  Toyota's motion to dismiss this claim on the

8    ground that the Act prohibits class actions is **DENIED**.

9        11.    North Carolina (Breach of Contract)

10   Toyota argues that Plaintiff Hakes's claim pursuant to the North Carolina Unfair and

11   Deceptive Trade Practices Act (Count 62) "should be dismissed because it is based on breach of

12   contract"—*i.e.*, the express written warranty—"which does not rise to the level of [an] unfair

13   practice."  Reply at 22.  Toyota cites the Fourth Circuit's decision in *Broussard v. Meineke*

14   *Discount Muffler Shops, Inc.*, 155 F.3d 331 (1998), for the proposition that, under North Carolina

15   law, "a mere breach of contract, even if intentional, is not sufficiently unfair or deceptive to

16   sustain an action under [the Act]."  *Id.* at 347; *see also* Mot. at 32-33 (quoting this passage).

17   Rather, "North Carolina law requires a showing of substantial aggravating circumstances to

18   support a claim under the [Act]" where it is based on a contractual breach.  *Broussard*, 155 F.3d at

19   347 (internal quotation omitted).

20   As Plaintiffs respond, however, *Broussard* is largely inapposite here.  The Fourth Circuit

21   in that case "ruled that plaintiffs['] NCUDTPA claim was barred because the dispute concerned

22   the parties' rights and obligations under certain [contracts] that governed 'every aspect of their

23   relationship.'"  Opp'n at 30 (quoting *Broussard*, 155 F.3d at 345).  While plaintiffs sued the

24   defendant for various common-law torts and violations of the Act, the *Broussard* court concluded

25   that the case represented "a straightforward contract dispute" and that plaintiffs' tort and statutory

26   consumer protection claims merely "parallel[ed]" or "piggyback[ed] on" their breach of contract

27   claims.  155 F.3d at 346-47.  The Fourth Circuit thus chided the district court for failing to

28   "differentiate between contract and deceptive trade practice claims, and [to] relegate claims

56

1    regarding the existence of an agreement, the terms contained in an agreement, and the

2    interpretation of an agreement to the arena of contract law." *Id.* at 347.

3            Plaintiff Hakes's consumer protection claim, in contrast, is "predicated on TMS's

4    misrepresentations and omissions" and is therefore "separate and distinct" from his express

5    warranty claim.  Opp'n at 30.  As discussed above in Part IV.B, Plaintiffs' claims for breach of the

6    NVLW and other express warranties (*e.g.*, Toyota's advertisements and the owner's manual) turn

7    on such issues as "the existence of an agreement, the terms contained in an agreement, and the

8    interpretation of an agreement"—all of which *Broussard* aptly characterizes as within "the arena

9    of contract law."  *See* 155 F.3d at 347.  Plaintiffs' claims under the Deceptive Trade Practices Act,

10   in contrast, concern Toyota's allegedly knowing misrepresentations about the fuel tank defect in

11   an effort to induce consumers to purchase the Vehicles.  Contrary to Toyota's protestations,

12   therefore, Plaintiff Hakes's consumer protection claim is not based merely "on a breach of

13   contract," nor are the "core allegations of Hakes's express warranty claim and NCUDTPA

14   claim . . . the same."  *See* Reply at 22.

15           This conclusion is informed by this Court's analysis of the related issue of whether North

16   Carolina law recognizes the economic loss rule (*i.e.*, whether the state bars claims under the

17   Deceptive Trade Practices Act where plaintiffs have a contractual remedy for their losses) in

18   *MyFord Touch*.  *See* 46 F. Supp. 3d at 966-67.  After surveying split authority on the question, the

19   Court ruled that the Act "gives rise to a duty independent of [a] contract and therefore should not

20   be barred by the economic loss rule."  *Id.* at 967.  The Middle District of North Carolina, in *Jones*

21   *v. BMW of North America, LLC*, 2020 WL 5752808 (M.D.N.C. Sept. 25, 2020), recently agreed,

22   holding that the economic loss rule did not bar a plaintiff's claims where he "plausibly claimed

23   that BMW violated a duty separate from those owed to him by [vehicle] warranties—specifically a

24   duty not to provide false information, or fraudulently remain silent, to induce execution of [a]

25   contract."  *Id.* at *10.  *Cf. Ellis v. Louisiana-Pacific Corp.*, 2011 WL 5402878, at *2 (W.D.N.C.

26   Nov. 8, 2011) (holding that a plaintiff's consumer protection claim was barred by the economic

27   loss rule where "the damage incurred by the plaintiff [was] not separate and apart from the damage

28   arising out of a breach of warranty claim").

United States District Court
Northern District of California

57

1     Toyota's motion to dismiss Plaintiff Hakes's consumer protection claim on the ground that

2     it merely duplicates his claim for breach of express warranty is therefore **DENIED**.

3          12.     <u>Ohio (Standing)</u>

4     Toyota raises three issues with respect to the Ohio Plaintiffs' claims under the state's

5     Deceptive Trade Practices Act (Count 69) and Consumer Sales Practices Act (Count 68). First,

6     Toyota argues that Plaintiffs lack standing to bring a Deceptive Trade Practices Act claim because

7     the Act "is not available to consumers." Mot. at 33. Second, Toyota contends that "Plaintiffs

8     have not sufficiently pleaded that TMS is a 'supplier' within the meaning of the Ohio Consumer

9     Sales Practices Act," a statute that "only provides a remedy to consumers who are subject to unfair

10     or deceptive practices by suppliers." *Id.* (emphasis removed). Third, Toyota asserts that

11     "Plaintiffs' failure to give TMS notice of alleged deceptive or unconscionable conduct also bars

12     their class allegations" since they "must allege that TMS had *prior notice* that its conduct was

13     allegedly 'deceptive or unconscionable.'" *Id.* at 34 n.16 (quoting *Pattie v. Coach, Inc.*, 29 F.

14     Supp. 3d 1051, 1055 (N.D. Ohio 2014)) (emphasis in original).

15     The Ohio Deceptive Trade Practices Act enumerates several types of proscribed conduct

16     and provides a cause of action for any "person" who is injured by such conduct. *See* Ohio Rev.

17     Code §§ 4165.02 and 4165.03(A)(2). The Act defines a "person" as "an individual, corporation,

18     government, governmental subdivision or agency . . . , or any other legal or commercial entity."

19     *Id.* § 4165.01. "Although the plain text of the law is broad enough to cover actions by

20     consumers," Plaintiffs acknowledge that "[c]ourts are split on whether consumers have standing to

21     sue under ODTPA." Opp'n at 31.

22     In *Phillips v. Philip Morris Companies, Inc.*, 290 F.R.D. 476 (N.D. Ohio 2013), the district

23     court stated that "[t]he vast majority of federal courts and all lower state courts to address the issue

24     have concluded that relief under the DPTA is not available to consumers." *Id.* at 482. These

25     courts focus on the statutory language "or any other legal or commercial entity," which they

26     believe "qualif[ies] the entire laundry list of entities that may bring suit" and "implies that the

27     individual must be involved in commercial activity." *Id.* at 482-83 (citing *Chamberlain v. Am.*

28     *Tobacco Co., Inc.*, 1999 WL 33994451, at *18 n.12 (N.D. Ohio Nov. 19, 1999)). They also

emphasize that the Act parallels the federal Lanham Act, which likewise "allows for suit by 'any *person* who believes that he or she is or is likely to be damaged by [a deceptive] act,'" but which has been construed by the federal courts of appeals to bar claims by consumers (in contrast to commercial entities). *Id.* at 483 (quoting 15 U.S.C. § 1125(a)(1)(B)) (emphasis in original); *see also Michelson v. Volkswagen Aktiengesellschaft*, 99 N.E.3d 475, 479-80 (Ohio Ct. App. 2018) (dismissing a consumer's claim under the ODTPA because "individual consumers are barred from bringing actions under the Lanham Act . . . and under Ohio's Deceptive Trade Practices Act").

Plaintiffs, however, point to two decisions from the Southern District of Ohio holding that the "plain language" of the Act does not support denying standing to consumers. Opp'n at 31. In *Bower v. IBM, Inc.*, 495 F. Supp. 2d 837 (S.D. Ohio 2007), the court noted that the statute is "silent on the issue of consumers" and that its definition of "person" did not expressly place any "limits on the type of individuals who can pursue a claim" under the Act. *Id.* at 843. The same court followed this line of reasoning in *Schumacher v. State Auto. Mut. Ins. Co.*, 47 F. Supp. 3d 618 (S.D. Ohio 2014), rhetorically asking why the Ohio legislature would have included the unqualified term "individual" in the Act's definition of "person" if did not intend "to give individual consumers the standing to sue." *Id.* at 632. At least one post-*Bower* case from the Southern District of Ohio, however, concluded that intervening state-court authority required dismissal of a consumer's claim under the Act. *See In re Porsche Cars N. Am.*, 880 F. Supp. 2d 801, 874-75 (S.D. Ohio 2012) (adopting the reasoning of *Dawson v. Blockbuster, Inc.*, 2006 WL 1061769, at *4 (Ohio Ct. App. Mar. 16, 2006)).

Granting this split of authority, the Court agrees with Toyota that the Deceptive Trade Practices Act does not confer standing on consumers. While Plaintiffs are correct that "the plain text of the law is broad enough to cover actions by consumers," the weight of authority— including all state caselaw cited by the parties—is clearly on Toyota's side. This conclusion also matches that of another court in this District that considered the same issue. *See Nexus 6P*, 293 F. Supp. 3d at 932-33 (emphasizing that "the Ohio Court of Appeals has held that the ODTPA affords no relief to consumers because the statute is designed to protect commercial actors against objectionable commercial conduct"). Toyota's motion to dismiss Ohio Plaintiffs' claim under the

1    Deceptive Trade Practices Act is therefore **GRANTED**.

2         Toyota next argues that Ohio Plaintiffs' claims under the Ohio Consumer Sales Practices

3    Act "are barred because TMS is not a supplier."  Reply at 23.  The OCSPA provides that "[n]o

4    supplier shall commit an unfair or deceptive act or practice in connection with a consumer

5    transaction," and defines "supplier" as a "seller, lessor, assignor, franchisor, or other person

6    engaged in the business of effecting or soliciting consumer transactions, whether or not the person

7    deals directly with the consumer."  Ohio Rev. Code § 1345.01-02 (emphasis added).  A "person,"

8    moreover, "includes an individual, corporation, government . . . , or other legal entity."  *Id.*

9    § 1345.01(B).

10         Toyota relies on *Michelson* to support its contention that it is not a "supplier" within the

11   meaning of the Act.  In that case, the plaintiff argued—as Plaintiffs do here—that "car

12   manufacturers may be liable under the CSPA when breach of contract or warranty is established."

13   99 N.E.3d at 479; *see also* Opp'n at 32.  In *Michelson*, the court found that the plaintiff failed to

14   establish that her defective vehicle was "covered under warranty, and [that she] made no

15   allegation that Volkswagen failed to repair it."  99 N.E.3d at 479.  The court thus held that her

16   "claim is not the type envisioned under the CSPA."  *Id.*  In contrast, in *Boyle v. Daimler Chrysler*

17   *Corp.*, 2002 WL 1881157 (Ohio Ct. App. 2002), the vehicle manufacturer was held liable under

18   the Act because, *inter alia*, "an alleged defect was covered under the terms of [the plaintiff's]

19   warranty" and the manufacturer "failed to repair the vehicle, thereby diminishing its value."  *Id.* at

20   *7.

21         As the foregoing discussion suggests, the caselaw cited by the parties does not clearly

22   articulate what a plaintiff must plead to state a claim under the OCSPA.  Under the plain terms of

23   the statute, however, Toyota would appear to be a supplier, as it is a corporation (*i.e.*, a "person")

24   "engaged in the business of effecting or soliciting consumer transactions."  Ohio Rev. Code

25   § 1345.01(B)-(C).  Moreover, the fact that Toyota does not necessarily "deal[] directly with the

26   consumer" is not a bar to liability under the Act.  *Id.* § 1345.01(C).  And the authority relied on by

27   Toyota suggests that, even if an automobile defect is not covered under a valid warranty at the

28   time of suit, plaintiffs may still plead a violation of the Act if they allege that the manufacturer

United States District Court
Northern District of California

60

1    "failed to repair" the defect.  *See Michelson*, 99 N.E.3d at 479.  Plaintiffs have done so here.  *See,*

2    *e.g.*, Compl. ¶ 31 ("Plaintiff Muccillo reported his fuel tank issue to Kings Toyota in October

3    2019[;] Toyota has not offered to repair or replace Plaintiff Muccillo's RAV4, or otherwise

4    offered any refund or other remedy.").  Further, in *Temple v. Fleetwood Enterprises, Inc.*, 133 Fed.

5    Appx. 254 (6th Cir. 2005), the Sixth Circuit stated that, "in order to make out a CSPA claim,

6    [plaintiffs] ha[ve] to present evidence that, in relation to a consumer transaction, [defendants]

7    engaged in deceptive behavior *or* failed to comply with a warranty."  *Id.* at 266 (citing, *e.g.*, *Boyle*,

8    2002 WL 1881157, at *7) (emphasis added).  As explained above, Plaintiffs have adequately

9    alleged that Toyota "engaged in deceptive behavior" in misrepresenting the Vehicles' fuel tank

10   capacity.  The Ohio Plaintiffs have stated a claim under the Act.

11       Toyota's motion to dismiss Ohio Plaintiffs' claim under the Ohio Consumer Sales

12   Practices Act on the ground that Toyota is not a "supplier" is therefore **DENIED**.

13       As to Toyota's contention that "Plaintiffs' failure to give TMS notice of alleged deceptive

14   or unconscionable conduct also bars their class allegations," Mot. at 34 n.16, it is inadequately

15   presented.  Toyota offers the argument in a footnote of its motion and does not address the issue in

16   its reply brief.  Plaintiffs, in any event, point out that "[a]llegations that an Ohio state court has

17   found the specific practice at issue either unconscionable or deceptive in a decision open to public

18   inspection are sufficient to satisfy the OCSPA notice requirement."  Opp'n at 33 (citing *Pattie v.*

19   *Coach, Inc.*, 29 F. Supp. 3d 1051, 1055 (N.D. Ohio 2014)).  Plaintiffs have included such

20   allegations in the complaint, *see* Compl. ¶ 904, which raises a reasonable inference that they have

21   satisfied the Act's notice requirement.

22       Toyota's motion to dismiss Ohio Plaintiffs' claim under the Ohio Consumer Sales

23   Practices Act on the ground that they failed to provide adequate notice of their class allegations is

24   therefore **DENIED**.

25       13.    <u>Pennsylvania (Economic Loss Doctrine)</u>

26       Finally, Toyota assert that Pennsylvania Plaintiffs' claim under the state's Unfair Trade

27   Practices and Consumer Protection Law (Count 78) must be dismissed because "the law of

28   contract provides an adequate remedy for their claim" and it is therefore "barred by the economic

United States District Court
Northern District of California

loss doctrine." Mot. at 34.  Toyota relies on *Werwinski v. Ford Motor Co.*, 286 F.3d 661 (3d Cir. 2002), in which the Third Circuit held that, under Pennsylvania law, the economic loss doctrine prevents "plaintiffs from recovering in tort economic losses to which their entitlement flows only from a contract." *Id.* at 671; *see* Mot. at 34, Reply at 23-24.  Plaintiffs counter that, after *Werwinski*, "Pennsylvania appellate courts have spoken and rejected its holding" that the economic loss doctrine bars a plaintiff's claim under the Consumer Protection Law.  *See* Opp'n at 33.

In March 2021, the Third Circuit decided *Earl v. NVR, Inc.*, 990 F.3d 310 (3d Cir. 2021). There, the court, noting more recent Pennsylvania appellate-court decisions in *Knight v. Springfield Hyundai*, 81 A.3d 940, 951-52 (Pa. Super. Ct. 2013), and *Dixon v. Northwestern Mutual*, 146 A.3d 780 (Pa. Super. Ct. 2016), overruled *Werwinski* and held "that the economic loss doctrine no longer may serve as a bar to UTPCPL claims."  990 F.3d at 314.

Thus, although "[t]he Pennsylvania Supreme Court has not weighed in directly on the applicability of the economic loss doctrine to the UTPCPL," Pennsylvania's appellate courts and the Third Circuit now agree that the economic loss doctrine does not preclude UTPCPL claims. Toyota's motion to dismiss the Pennsylvania Plaintiffs' consumer protection claim on the basis of the economic loss doctrine is therefore **DENIED**.

F.      Unjust Enrichment

Plaintiffs assert a claim for unjust enrichment under the common law of California, but they contend that "the claim would be nearly identical under the laws of any other state."  Opp'n at 34 & n.12.  In its motion to dismiss, Toyota argues that unjust enrichment in California "is not a cause of action, but a theory of recovery and California courts routinely dismiss such 'claims.'" Reply at 24.  Toyota also implies that California law should not apply to the putative nationwide class (or any other states' subclasses) because, contrary to Plaintiffs' representations, "the law of unjust enrichment varies across states in material ways."  Mot. at 35.  Toyota points to such purported discrepancies as some states' recognition of unjust enrichment claims only "when no possible legal remedy is available" and others' requirement that plaintiffs allege conferral of a direct benefit on defendants.  *Id.* at 34-35.

1        As an initial matter, Toyota's argument that California does not recognize unjust

2   enrichment as a standalone cause of action has been foreclosed by *Astiana v. Hain Celestial*

3   *Group, Inc.*, 783 F.3d 753 (9th Cir. 2015).  In *Astiana*, the Ninth Circuit explained that, under

4   California law, an unjust enrichment claim may be construed as "as a quasi-contract claim seeking

5   restitution." *Id.* at 762 (quoting *Rutherford Holdings, LLC v. Plaza Del Rey*, 223 Cal. App. 4th

6   221, 231 (2014)).  Consequently, the "Supreme Court of California and California Courts of

7   Appeal have recognized actions for relief under the equitable doctrine of unjust enrichment."

8   *Naoko Ohno v. Yuko Yasuma*, 723 F.3d 984, 1006 (9th Cir. 2013) (citing *Ghirardo v. Antonioli,* 14

9   Cal.4th 39 (1996)).  "The doctrine applies where plaintiffs, while having no enforceable contract,

10   nonetheless have conferred a benefit on defendant which defendant has knowingly accepted under

11   circumstances that make it inequitable for the defendant to retain the benefit without paying for its

12   value." *Hernandez v. Lopez,* 180 Cal. App. 4th 932, 938 (2009); *see also Swearingen v. Late July*

13   *Snacks LLC*, 2017 WL 1806483, at *8 (N.D. Cal. May 5, 2017) (delineating the doctrine on this

14   issue).

15        "[Toyota] is therefore incorrect that the unjust enrichment claim should be dismissed

16   solely on the ground that no such claim is cognizable under California law." *See Swearingen*,

17   2017 WL 1806483, at *8.  The California Plaintiffs' allegations concerning Toyota's presale

18   knowledge of the fuel tank defect adequately state a claim for unjust enrichment on the theory that

19   Plaintiffs "have conferred a benefit" on Toyota, which the company "has knowingly accepted

20   under circumstances that make it inequitable for the defendant to retain the benefit without paying

21   its value." *See Hernandez*, 180 Cal. App. 4th at 938.  Toyota's motion to dismiss Plaintiffs' unjust

22   enrichment claim is **DENIED** with respect to the California Plaintiffs.

23        The question nevertheless remains whether California's unjust enrichment law should

24   apply to all members of a putative nationwide class under the state's choice-of-law rules.  Toyota

25   argues that it cannot because, *inter alia*, a claim for "unjust enrichment is not recognized in many

26   states" and, "where recognized[,] Plaintiffs would be required to plead that they conferred a

27   benefit directly on TMS, which they have not" done.  Reply at 24.  Plaintiffs counter that because

28   "[t]his is an action brought in federal district court under diversity jurisdiction," "the substantive

law of California, the forum state, applies." Opp'n at 34.

The Ninth Circuit's decision in *Mazza*, 666 F.3d 581 (9th Cir. 2012), is on point. There, the court reversed a district court's certification of a nationwide class of Honda purchasers and lessees who brought claims under California's CLRA, UCL, and FLA, as well as a claim for unjust enrichment. *See id.* at 585. *Mazza* began its analysis by noting that a "federal court sitting in diversity must look to the forum state's choice of law rules to determine the controlling substantive law." *Id.* at 589 (quoting *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1187 (9th Cir. 2001)). The court then explained that, under California law, "the class action proponent bears the initial burden to show that California has 'significant contact or significant aggregation of contacts' to the claims of each class member"; "[s]uch a showing is necessary to ensure that application of California law is constitutional." *Id.* at 589-90 (internal quotations omitted). Once that threshold showing has been made, "the burden shifts to the other side to demonstrate 'that foreign law, rather than California law, should apply to the class claims.'" *Id.* at 590 (quoting *Wash. Mut. Bank v. Superior Court*, 24 Cal.4th 906, 921 (Cal. 2001)). To determine whether the interests of other states outweighed California's interest, courts are to apply "a three-step governmental interest test" asking: (1) whether there is a difference between "the relevant law[s] of each of the potentially affected jurisdictions with regard to the particular issue in question"; (2) if there is a difference, "whether a true conflict exists" between "each jurisdiction's interest in the application of its own law under the circumstances of the particular case"; and (3) if there is a conflict, "which state's interest would be more impaired if its policy were subordinated to the policy of the other state." *Id.* (quoting *McCann v. Foster Wheeler LLC*, 48 Cal.4th 68, 81-82 (Cal. 2010)). Having completed this analysis, a court "applies the law of the state whose interest would be more impaired if its law were not applied." *Id.* (internal quotation omitted).

At the threshold stage of the analysis, the Ninth Circuit held that there were significant California contacts to the claims of each class member because, *inter alia*, Honda's corporate headquarters and one-fifth of the proposed class members were located in California. *Id.* The court then proceeded to the three-step governmental interest test. At step one, Honda identified several material differences in the consumer protection laws of the potentially affected

64

jurisdictions, such as variations among states' scienter and reliance requirements and the range of potential remedies. *See id.* at 590-91. The court likewise concluded that "[t]he elements necessary to establish a claim for unjust enrichment *also vary materially* from state to state." *Id.* at 591 (emphasis added). At step two, the court held that each state had an interest in applying its own laws to its residents such that the application of California law to all class members would create a "true conflict." *Id.* at 591-92. Notably, the court found that the potentially enhanced protections for consumers afforded by California law was not dispositive because other states also had valid interests in shielding businesses from what those states might consider excessive liability. *Id.* at 592. At step three, the court posited that each "jurisdiction ordinarily has the predominant interest in regulating conduct that occurs within its borders," *id.* at 592 (internal quotation omitted), and that "California's interest in applying its law to residents of foreign states is attenuated," *id.* at 594. The court again stressed that "each foreign state has an interest in applying its law to transactions within its borders and that, if California law were applied to the entire class, foreign states would be impaired in their ability to calibrate liability to foster commerce." *Id.* at 593. And while it found that California maintained "an interest in regulating those who do business within its state boundaries," that interest did not outweigh those of foreign states applying "*their* laws to transactions between *their* citizens and corporations doing business within *their* state." *Id.* at 594 (emphasis added).

The Ninth Circuit thus held "that each class member's consumer protection claim should be governed by the consumer protection laws of the jurisdiction in which the transaction took place." *Id.* In doing so, the *Mazza* court did not explicitly include plaintiffs' unjust enrichment claims in its holding. But the court's reasoning prescribes the same result.

In light of *Mazza*, the Court finds that Plaintiffs cannot assert a nationwide claim for unjust enrichment under California law. *See* Hearing Tr. at 35-36. While Plaintiffs have likely satisfied the threshold requirement of a significant aggregation of contacts—Toyota and approximately 11% (or four out of thirty-six) of the named plaintiffs are citizens of California, *see* Compl. ¶¶ 7-9, 33, 40—*Mazza* expressly concluded, at step one of the governmental interest test, that "[t]he elements necessary to establish a claim for unjust enrichment . . . vary materially from state to

United States District Court
Northern District of California

1    state." 666 F.3d at 591.  Additionally, as Toyota argues (and Plaintiffs do not dispute), eight of

2    the twenty-eight states in which Plaintiffs reside "either do not recognize a claim for unjust

3    enrichment, or only recognize it as an equitable remedy when no possible legal remedy is

4    available." Mot. at 34, Opp'n at 34.  These differences appear to reflect the sorts of policy

5    disagreements in states' balancing of consumer and business interests that the *Mazza* court insisted

6    were to be respected as part of California's choice of law analysis.  *See* 666 F.3d at 592.

7    Following *Mazza*, therefore, this Court is left to conclude that "California's interest in applying its

8    law to residents of foreign states is attenuated" and that "each class member's [unjust enrichment]

9    claim should be governed by the [unjust enrichment] laws of the jurisdiction in which the

10   transaction took place." *See id.* at 594.  *See also Julian v. TTE Tech., Inc.*, 2020 WL 6743912, at

11   *8-10 (N.D. Cal. Nov. 17, 2020) (accord).

12          The Court therefore **DENIES** Toyota's motion to dismiss Plaintiffs' unjust enrichment

13   claims as to the California Plaintiffs.  It **GRANTS** the motion with respect to the non-California

14   Plaintiffs without leave to amend.

15   G.      Standing for Injunctive and Declaratory Relief

16          Plaintiffs also seek injunctive and declaratory relief requiring Defendants to cease and

17   desist from representing that the Vehicles have a fuel-tank capacity of 14.5 gallons.  *See, e.g.*,

18   Compl. ¶ 472.  Toyota contends that Plaintiffs lack standing to seek such relief because they fail to

19   allege that they are "likely to purchase another Subject Vehicle," Mot. at 36, and they repeatedly

20   state that they would not have purchased the products, or would have paid less for them, had they

21   known that the Vehicles' fuel tanks could only hold 8-11 gallons, *see, e.g.*, Compl. ¶ 6.

22          "[A] plaintiff must demonstrate standing separately for each form of relief sought."

23   *Mayfield v. United States*, 599 F.3d 964, 969 (9th Cir. 2010) (quoting *Friends of the Earth, Inc. v.

24   Laidlaw Envtl. Serv., Inc.*, 528 U.S. 167, 185 (2000)).  "Thus, a plaintiff who has standing to seek

25   damages for a past injury . . . does not necessarily have standing to seek prospective relief" such as

26   an injunction.  *See id.*  "Once a plaintiff has been wronged, he is entitled to injunctive relief only if

27   he can show that he faces a 'real or immediate threat . . . that he will again be wronged in a similar

28   way.'" *Id.* at 970 (quoting *City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983)).  In the context

of misrepresentation claims, the Ninth Circuit has held "that a previously deceived consumer may have standing to seek an injunction against false advertising or labeling, even though the consumer now knows or suspects that the advertising was false at the time of the original purchase." *Davidson v. Kimberly-Clark Corp.*, 889 F.3d 956, 969 (9th Cir. 2018).  Consumers can plead a cognizable threat of future harm where they allege, for example, "that [they] will be unable to rely on the product's advertising or labeling in the future, and so will not purchase the product although [they] would like to do so," or "that [they] might purchase the product in the future, despite the fact it was once marred by false advertising or labeling, as [they] may reasonably, but incorrectly, assume the product was improved." *Id.* at 970.  While the Ninth Circuit "thus gives a plaintiff in a mislabeling case the opportunity to seek injunctive relief, the plaintiff is still required to allege that she would like to purchase the defendant's product in the future." *Julian*, 2020 WL 6743912, at *8.

As the Court stated at the motion hearing, it finds that Plaintiffs have failed to plead standing for injunctive or declaratory relief.  Hearing Tr. at 33.  Although courts have found standing in circumstances broadly similar to those here, *see, e.g.*, *Koehler v. Litehouse, Inc.*, 2012 WL 6217635, at *6 (N.D. Cal. Dec. 13, 2012); *Ries v. Ariz. Beverages USA LLC*, 287 F.R.D. 523, 533 (N.D. Cal. 2012), in most of these cases plaintiffs specifically alleged an interest in purchasing defendants' products in the future.  *See, e.g.*, *Ries*, 287 F.R.D. at 527 (holding that plaintiffs had standing to pursue injunctive relief where, *inter alia*, they asserted their intent to purchase the contested product in the future); *Weidenhamer v. Expedia, Inc.*, 2015 WL 1292978, at *5 (W.D. Wash Mar. 23, 2015) (reaching the same conclusion where, *inter alia*, the plaintiff adequately alleged that he "hoped to remain [the defendant's] customer").  As such, their injury was ongoing; absent injunctive relief, "they could not rely on [defendants'] representation[s] with any confidence."  *See Ries*, 287 F.R.D. at 533.  Indeed, this Court has previously held that "to establish standing" in a consumer product-liability case "the plaintiff must allege that he intends to purchase the products at issue in the future." *Swearingen*, 2016 WL 4382544, at *13; *see also Lyons*, 461 U.S. at 102 (holding that "[p]ast exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing,

1    present adverse effects").

2            At the motion hearing, Plaintiffs acknowledged deficiencies in the operative complaint

3    regarding injunctive relief but suggested that Plaintiffs "do have standing for injunctive relief for

4    purposes of seeking to repair their vehicles."  Hearing Tr. at 33.  Plaintiffs conveyed that their

5    interest in pursuing this form of relief was contingent on the success of Toyota's "purported

6    repair" for the Vehicles' fuel-tank defect.  *See id.*  While the Court declines to rule on this issue

7    here, as such relief was not requested in the complaint, it tentatively agrees that Plaintiffs would

8    likely have standing to seek this type of injunction if Toyota's ongoing repair efforts prove

9    unsatisfactory.  But such relief is different from that presently sought.

10           Because Plaintiffs fail to allege that they either plan or are likely to purchase another

11   Vehicle, they do not presently have Article III standing to pursue injunctive or declaratory relief as

12   sought in the complaint.  The Court therefore **GRANTS** Toyota's motion to dismiss as to these

13   claims but grants Plaintiffs leave to amend.

14   H.      Nationwide Class Allegations

15           Finally, Toyota argues that Plaintiffs' attempt to represent a nationwide class is untenable

16   because Plaintiffs include citizens of only twenty-eight states.  Toyota contends that Plaintiffs

17   cannot assert claims on behalf of those who purchased or leased Vehicles in twenty-two other

18   states.  *See* Mot. at 36-37.  While Toyota acknowledges that "class allegations 'typically are

19   tested' at the class certification stage," *id.* at 36 (quoting *Swearingen*, 2017 WL 1806483 at *9), it

20   urges that "claims arising under the laws of states in which no named plaintiff resides should be

21   dismissed for lack of standing at the motion to dismiss stage," *id.* at 37 (quoting *Sponchiado v.*

22   *Apple Inc.*, 2019 WL 6117482, at *7 (N.D. Cal. Nov. 18, 2019)).  Toyota further argues that

23   Plaintiffs should not be permitted to circumvent this purported standing deficiency by applying the

24   laws of their home states to residents of other states.  *Id.* at 37.  In making this argument, Toyota

25   emphasizes the general "presumption against extraterritorial application of state law."  *Id.*; *see*

26   *also Swearingen*, 2017 WL 1806483, at *9 (dismissing nationwide class allegations where

27   plaintiffs offered "no allegations supporting a nexus between California law and any out of state

28   purchases, and in light of the presumption against extraterritorial application" of California's

                                              68

1    consumer protection laws).

2        Plaintiffs respond that "TMS seeks premature resolution of the class allegations at least

3    with respect to a nationwide class, denying Plaintiffs the opportunity to make the case for

4    certification based on appropriate discovery." Opp'n at 36.  They emphasize that "[t]he

5    overwhelming majority of case law holds that it is inappropriate to determine class certification

6    issues, such as choice of law, at the pleading stage." *Id.* (collecting several cases from this

7    district).  Plaintiffs also argue that Ninth Circuit law requires "a detailed and fact-intensive

8    inquiry . . . to determine the substantive law applicable to class members' claims" and that

9    Toyota's challenge to the nationwide class allegations is therefore "better suited for class

10   certification, when the parties—and the Court—can evaluate the nationwide claims on a complete

11   record." *Id.* at 37.

12       Toyota's motion to dismiss thus raises the question of "whether it is appropriate to

13   evaluate the named plaintiffs' standing on behalf of the putative nationwide class at the pleadings

14   (rather than at the class certification) stage, and if so, whether the named plaintiffs have standing

15   to bring state law claims on behalf of a class that includes citizens of unrepresented states."

16   *Johnson*, 272 F. Supp. 3d at 1174.

17       As to the first (procedural) question, the *Johnson* court observed that "[t]here is no hard

18   and fast rule to apply" when addressing these issues.  *Id.* at 1175.  It relied, however, on this

19   Court's extensive analysis in *In re Carrier IQ, Inc.*, 78 F. Supp. 3d 1051 (N.D. Cal. 2015), which

20   concluded "that district courts 'ha[ve] the discretion to defer questions of standing until after class

21   certification,' but may nonetheless 'opt[], as a matter of case management,' to address standing in

22   advance of class certification." *Id.* (quoting *Carrier IQ*, 78 F. Supp. 3d at 1074).  In reaching this

23   decision, the *Carrier IQ* court reasoned that "a strict categorical requirement that the standing

24   analysis must precede class certification is unwarranted" even though courts in this district and

25   beyond have treated standing "as a threshold matter that should be addressed at the pleading

26   stage."  78 F. Supp. 3d at 1069-70; *see also id.* at 1071-73 (observing that "the Supreme Court has

27   expressly recognized that, in at least some cases, courts may address class certification prior to

28   resolving standing questions" and concluding that "decid[ing] class certification before

United States District Court
Northern District of California

United States District Court
Northern District of California

1    determining standing to pursue claims of unnamed class members is consistent with Article III").

2    As to the second (substantive) question, the *Carrier IQ* court ultimately chose not to

3    exercise its asserted discretion to defer the standing inquiry until after class certification, finding

4    that the named plaintiffs did "not have standing to assert claims from states in which they d[id] not

5    reside or did not purchase" the contested products. *Id.* at 1075.  It thus "require[d] that plaintiffs

6    present named class representatives who possess individual standing to assert each state law's

7    claims against Defendants." *Id.* at 1074.  The court emphasized that plaintiffs in that case resided

8    in thirteen different states but were attempting to bring claims on behalf of consumers in thirty-

9    five additional states, as well; the unnamed class members' claims were therefore "vast relative to

10   the claims to which the named Plaintiffs ha[d] standing." *Id.*  It also noted that, "given the breadth

11   of the proposed class and the number of state law claims asserted on behalf of the class, there

12   [wa]s a meaningful risk that the requirements of class certification under Rule 23 [would] not be

13   met." *Id.*  Cases involving a smaller number of named plaintiffs have been resolved at the

14   pleading stage on similar grounds. *See, e.g.*, *Johnson*, 272 F. Supp. 3d at 1175-76 (dismissing

15   nationwide class allegations where there were only "two named representatives in two states").  In

16   other instances, however, courts have declined to decide standing for a putative nationwide class

17   prior to class certification where named plaintiffs resided in close to fifty states. *See In re Target

18   Corp. Data Sec. Breach Litig.*, 66 F. Supp. 3d 1154, 1160 (D. Minn. 2014) (permitting class

19   certification to proceed in a case with "114 named Plaintiffs who reside in every state in the union

20   save four and the District of Columbia").

21   As the Court stated at the motion hearing, it intends to exercise its discretion to defer ruling

22   on Plaintiffs' nationwide class allegations until a later stage of the proceedings.  Hearing Tr. at 34.

23   The Court explained that the viability of the allegations, and the most appropriate time to address

24   Plaintiffs' standing to assert them, would turn, at least in part, on which claims survived the

25   pleading stage. *See id.*  The Court indicated that the outcome of a standing analysis might well

26   depend, for example, on the degree of variation among the state laws under which Plaintiffs

27   ultimately state claims. *Id.* at 34-35.  The Court also reiterated its reluctance to apply California

28   law extraterritorially, for the reasons previously given in Part IV.F. *See id.* at 35-36.  And in

1    response to the parties' reassertion of the substantive arguments for and against unnamed class

2    members' standing that they also raised in their briefs, the Court concluded that the issue would be

3    better addressed a later juncture, such as at class certification.  *Id.* at 38.  It nevertheless

4    "reserve[d] the ability to rule on some aspect" of the standing question earlier than the certification

5    stage, as the Court achieves greater clarity on the ultimate scope of Plaintiffs' claims.

6          The Court therefore **DENIES** Toyota's motion to dismiss Plaintiffs' nationwide class

7    allegations at this time.  It reserves the right to revisit the issue at its discretion as the litigation

8    progresses.

9                                    **V.      CONCLUSION**

10         For the reasons given above, Toyota's motion to dismiss Plaintiffs' consolidated class

11   action complaint is:

12         • **DENIED** as to Plaintiffs' standing to assert claims for damages;

13         • **GRANTED** as to Plaintiffs' express warranty claims under the NVLW (without

14            leave to amend);

15         • **GRANTED** as to Plaintiffs' express warranty claims under Toyota's marketing

16            materials and Vehicle owner's manuals (with leave to amend);

17         • **GRANTED** as to Plaintiffs' implied warranty of merchantability claims (without

18            leave to amend);

19         • **GRANTED** as to Plaintiffs' affirmative misrepresentation claims under certain

20            state consumer protection laws (with leave to amend);

21         • **DENIED** as to Plaintiffs' fraudulent omission claims under certain state consumer

22            protection statutes;

23         • **GRANTED in part** and **DENIED in part** as to Plaintiffs' consumer protection

24            claims on various state-specific grounds;

25         • **DENIED** as to California Plaintiffs' unjust enrichment claim;

26         • **GRANTED** as to non-California Plaintiffs' unjust enrichment claims (without

27            leave to amend);

28         • **GRANTED** as to Plaintiffs' standing to assert claims for injunctive and declaratory

1    relief (without leave to amend);

2    • **DENIED** as to Plaintiffs' nationwide class allegations.

3

4    Plaintiffs shall file their amended complaint within thirty (30) days from the date of this

5    order.

6    This order disposes of Docket No. 66.

7

8    **IT IS SO ORDERED**.

9

10    Dated: April 9, 2021

11

12

13    _____
      EDWARD M. CHEN
      United States District Judge

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28